Judith M. PRITZLAFF, Plaintiff-Appellant,†

v.

ARCHDIOCESE OF MILWAUKEE, Defendant-Respondent-Petitioner,

Reverend John T. DONOVAN, Defendant-Respondent,

ARIZONA HEALTH CARE COSTS CONTAINMENT SYSTEM and Health Care Financing Administration, Defendants.

Supreme Court

*No. 93–1846. Oral argument April 26, 1995.—Decided June 27, 1995.*

(Also reported in 533 N.W.2d 780.)

†Motion for Reconsideration denied September 19, 1995.

303

305

For the defendant-respondent-petitioner there were briefs by *Matthew J. Flynn, Kevin P. Crooks, Katherine H. Grebe* and *Quarles & Brady*, Milwaukee and oral argument by *Matthew J. Flynn*.

For the plaintiff-appellant there was a brief and oral argument by *Robert S. Sosnay*, Milwaukee.

Amicus curiae brief was filed by *M. Christine Cowles, Mary Beth Castino* and *Mohr & Anderson, S.C.*, Hartford for the Wisconsin Insurance Alliance.

DAY, J. This is a review of a decision of the court of appeals reversing an order of the circuit court for Milwaukee County, Honorable John G. Bartholomew, presiding, that dismissed all claims against the Archdiocese of Milwaukee (Archdiocese) and the Reverend

Father John Donovan (Fr. Donovan) arising out of a relationship that was alleged to have occurred between Fr. Donovan and Ms. Judith M. Pritzlaff from 1959 to 1965 for failure to state a claim upon which relief can be granted and because the claims were barred by the statute of limitations. Section 802.06, Stats. (1993–94). We conclude that to allow the claim to proceed against the Archdiocese based on Ms. Pritzlaff's allegation concerning Fr. Donovan despite the passage of twenty-seven years since the end of the alleged relationship would be contrary to the public policy of the State. We also conclude that the claims of negligent hiring, retaining, training and supervision are barred by the First Amendment in this case. We therefore reverse that portion of the decision of the court of appeals which remanded the case for a trial of the negligent hiring, training and supervision claim against the Archdiocese.

Ms. Pritzlaff first filed a complaint against Fr. Donovan and the Archdiocese on November 12, 1992. The relevant allegations from her complaint are as follows:

4. That at all times material, defendant Donovan was a Roman Catholic priest and an agent/representative of the defendant Archdiocese.

5. That defendant Donovan first met the plaintiff while she was a high school student in the late 1950's.

6. That thereafter, while acting in his capacity as a priest, defendant Donovan used said position to develop a friend like relationship with the plaintiff.

7. That defendant Donovan continued said relationship with the plaintiff.

8. That defendant Donovan did in fact use said relationship and his position as a priest to coerce the plaintiff to have a sexual relationship with him.

9. That as a result of the actions of defendant Donovan, the plaintiff has suffered and continues to suffer from severe emotional distress, causing and contributing to the break-up of her marriage, separation from her children, loss of jobs and other difficulties.

. . .

11. That at all times the defendant Archdiocese knew or should have known the type of conduct being pursued by Donovan and should have taken steps to stop same.

Five days later, on November 17, 1992, Fr. Donovan filed a motion to dismiss for failure to state a claim, asserting among other things that the claim was barred by the statute of limitations. On December 28, 1992, the Archdiocese also filed a motion to dismiss for failure to state a claim which asserted that the alleged conduct of Fr. Donovan was not tortious, that the action was barred by the statute of limitations, and that the Archdiocese was not responsible as a matter of law for the alleged conduct of Fr. Donovan.

In apparent response to the defendants' motions, on January 20, 1993, Ms. Pritzlaff filed an amended complaint. The amended complaint was divided into two causes of action. The first cause of action was against Fr. Donovan for his alleged actions. The second cause of action was against the Archdiocese and incorporated by reference all of the allegations against Fr. Donovan. The amended complaint reasserted most of the allegations made above and added the following relevant allegations:

9. That defendant DONOVAN did in fact use said relationship and his position as a priest to force and coerce the plaintiff to have a sexual relationship with him without her consent.

10. That Defendant DONOVAN caused Plaintiff JUDITH M. PRITZLAFF, to suffer and continues to suffer from severe emotional distress, causing and contributing to the break-up of her marriage, separation from her children and serious personal injuries, including but not limited to severe and painful psychological injuries, which injuries are permanent in nature and have caused her to incur pain, suffering, humiliation, disability, loss of earning capacity and a loss of an ability to enjoy life and expenses for medical and psychological treatment.

11. As a result of the psychological distress caused by the sexual advances and the coping mechanisms which were subsequently developed by JUDITH M. PRITZLAFF, she has suppressed and been unable to perceive the existence, nature or cause of her psychological and emotional injuries until approximately April, 1992.

. . .

15. That upon information and belief, and at all times material hereto, the ARCHDIOCESE was responsible for the training and placement and supervision of archdiocesan priests and the assignment of those priests into archdiocesan's schools and church parishes within the Milwaukee Archdiocese.

16. The ARCHDIOCESE had a duty to admit only qualified candidates into the priesthood, properly test and screen candidates for the priesthood and priests to ascertain if such persons had an illness or sexual inclination which caused a priest to be sexually attracted to teenage girls/young women, . . .

309

prior to placing a priest in to the community, to make appropriate placements of priest considering all relevant factors, supervise the priests which the archdiocese placed into the community, to counsel and guide priests in dealing with issues of celibacy and human sexuality and to supervise the operation of the various parishes located within the Archdiocese, including but not limited to all parishes at which DONOVAN served.

. . .

20. The ARCHDIOCESE knew or should have known that DONOVAN had a sexual problem prior to 1959 and acted willfully, intentionally and in wanton and reckless disregard. of the rights and safety of plaintiff by failing to remove DONOVAN from serving as a priest . . ..

On February 8, 1993 and February 26, 1993, Fr. Donovan and the Archdiocese again filed motions to dismiss for failure to state a claim. In addition to the reasons stated in their first motions to dismiss, the Archdiocese asserted that the negligent supervision claim was inadequately pleaded and that First Amendment precluded a court from finding any liability on the part of the Archdiocese for negligent supervision. Ms. Pritzlaff did not respond to the defendants' motion to dismiss until March 31, 1993. The Archdiocese asserted that this failure to file a timely brief in opposition to the motion to dismiss was also a ground for dismissing the complaint.

On April 26, 1993, the circuit court granted the defendants' motions to dismiss. The court held that the Archdiocese was not responsible under the doctrine of respondeat superior since the alleged actions of Fr. Donovan could not have been in the scope of his employment, that there is no basis to hold the Archdio-

cese liable on a theory of negligence, and that the statute of limitations bars the claims both because the plaintiff failed to exercise due diligence in discovering her claim and because "to allow this action to proceed after a passage of 27 years would be fundamentally wrong and in clear violation of sound public policy." Ms. Pritzlaff appealed the circuit court order.

On August 23, 1994, the court of appeals held that the claims were not barred by the statute of limitations. It also held that the circuit court erred when it declined to recognize the claim of negligent supervision. However, the court of appeals affirmed the circuit court's conclusion that the Archdiocese was not liable on a theory of respondeat superior. The Archdiocese, but not Fr. Donovan, petitioned this court for review of the court of appeals' decision. We granted that petition for review.[1]

Ms. Pritzlaff did not file a cross-petition seeking review of the court of appeals decision that the Archdiocese could not be held liable on a theory of respondeat superior. That issue is therefore not before this court.

This case requires this court to review the pleadings to determine if they state a claim upon which relief can be granted. When undertaking such a review, this court liberally construes the pleadings, and accepts the allegations in the pleadings as true. *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 635–36, 517 N.W.2d 432 (1994). Further, this court will dismiss

---

[1] Fr. Donovan did not petition this court for review in a timely manner. However, Ms. Pritzlaff's second cause of action incorporates by reference the allegations against Fr. Donovan and the claims against the Archdiocese are predicated on those allegations. Therefore, it is necessary for this court to discuss Ms. Pritzlaff's allegations against Fr. Donovan.

claims for failure to state a claim upon which relief can be granted only if "it is quite clear that under no conditions can the plaintiff recover." *Id.* at 636.

■

A threshold question when reviewing a complaint is whether the complaint has been timely filed, because an otherwise sufficient claim will be dismissed if that claim is time barred. Section 802.06, Stats. (1993–94). Since we conclude that Ms. Pritzlaff's twenty-seven year old claim is time barred, we reverse that portion of the decision of the court of appeals which remanded the claim against the Archdiocese for negligent supervision.

■

The relevant statute of limitations for actions against the Archdiocese is three years. *See* sec. 330.205, Stats. (1963), and its successor, sec. 893.54, Stats. (1993–94). The three year period begins on the same date that the cause of action accrued against Fr. Donovan. Thus, unless the statute of limitations was tolled, Ms. Pritzlaff filed her claims well past the time allowed by statute. However, under some circumstances, public policy dictates that the date that a cause of action accrues be well after the date of the act that caused harm. Those circumstances are outlined in the judicially created "discovery rule." We assume, without deciding, that the discovery rule applies to the Archdiocese.[2]

---

[2] At least one court has declared that the statute of limitations will not be extended against an employer based on the discovery rule. That court stated:

It is one thing to extend a statute of limitations to the individual primarily responsible for the plaintiff's injuries, and another to apply an open-ended period of limitations to the employer of the assailant. To allow lawsuits based on an employer's negligence in

312

The first Wisconsin case to approve the discovery rule was *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 335 N.W.2d 578 (1983). In that case, the plaintiff was allegedly injured by a "Dalkon Shield" intrauterine device manufactured by the defendant and inserted into her uterus in 1974. *Id.* at 552. She began to suffer symptoms some time just prior to June 13, 1978, and sought medical care on June 16, 1978. *Id.* However, her doctor told her she was in good health and noted that she had no symptoms on that day. *Id.* The symptoms returned, and on June 26, 1978, the plaintiff went to another doctor. *Id.* at 553. That doctor removed the Dalkon Shield and correctly diagnosed her condition as pelvic inflammatory disease. *Id.* She filed suit on June 24, 1981. *Id.* This court, in rejecting the statute of limitations defense asserted by A.H. Robins, Inc., held that the cause of action accrued on the date the injury was discovered or with reasonable diligence should be discovered, not on the date of the act that resulted in the injury. *Id.* at 560. Therefore, since the plaintiff discovered the injury on June 26, 1978 and commenced her action on June 24, 1981, the action was not barred by the three year statute of limitations. *Id.* at 561.

hiring, training and retaining an employee years after the abuse is alleged to have occurred, and, in many cases, years after the assailant's employment has ended, would, we believe, have serious economic repercussions which would stifle business growth.

More importantly, it would deny such defendants a meaningful opportunity to defend against such accusations.

*Debbie Reynolds Prof. Rehearsal Studios v. Superior Court,* 25 Cal. App. 4th 222, 233 (1994). However, other courts have assumed that the discovery rule also applies to the employer. *Doe v. Coffee County. Bd. of Educ.,* 852 S.W.2d 899, 908 (Tenn. App., 1992); *Callahan v. State,* 464 N.W.2d 268, 273 (Iowa, 1990).

Three years later, this court expanded the scope of the discovery rule in *Borello v. U.S. Oil Co.,* 130 Wis. 2d 397, 388 N.W.2d 140 (1986). There, the defendant installed a furnace in the plaintiff's home in December 1977. *Id.* at 400. On December 29, 1977, the plaintiff complained to the defendant in a letter that her previous furnace problems were worse with the new furnace and also complained of an odor from the furnace, respiratory problems and headaches. *Id.* She consulted three physicians, all of whom told her that her complaints could not, with any degree of certainty, be attributed to the furnace. *Id.* at 401. She was hospitalized on February 5, 1979. *Id.* at 401–02. When she returned to her home on February 20, 1979, she found flat surfaces covered with a red dust. *Id.* at 402. She asserted that she then knew that the furnace was the cause of her illness. *Id.* However, on March 12, 1979, she consulted another doctor who said he did not believe that her symptoms were related to the furnace. *Id.* Finally, in October 1979, she consulted an occupational medicine specialist who concluded that her symptoms were a result of metal fume fever caused by the furnace. *Id.* at 402–03. She filed her complaint in November 1981. *Id.* at 403. "Accordingly, we are confronted by a situation where a complainant was injured more than three years before the filing of the complaint and almost contemporaneously with that injury formed her own layperson's subjective opinion that the furnace was the cause. Yet at every turn, she was told by professionals, . . . that the furnace fume problem was irrelevant." *Id.* at 403–04. "A person who has used reasonable diligence to secure medical advice should be given the protection of one who is 'blamelessly ignorant.' " *Id.* at 414. This court held that "cause of action does not accrue until the nature of the injury *and* the

314

cause—or at least a relationship between the event and the injury—is or ought to have been known to the claimant." *Id.* at 406–07.

Ms. Pritzlaff argues that her claim is saved by the discovery rule because "she has suppressed and been unable to perceive the existence, nature or cause of her psychological and emotional injuries until approximately April, 1992." Therefore, she argues that her suit, commenced November 12, 1992, is timely.

We conclude that Ms. Pritzlaff's claim does not qualify for the tolling of the statute of limitations provided by the discovery rule because Ms. Pritzlaff knew of all of the elements of her underlying claim against Fr. Donovan, at the latest, by the time the relationship between the two ended.

It is well settled that a cause of action accrues when there exists a claim capable of enforcement, a suitable party against whom it may be enforced, and a party with a present right to enforce it. *Meracle v. Children's Serv. Soc'y.,* 149 Wis. 2d 19, 437 N.W.2d 532 (1989); *Barry v. Minahan,* 127 Wis. 570, 573, 107 N.W. 488 (1906). A party has a present right to enforce a claim when the plaintiff has suffered actual damage, defined as harm that has already occurred or is reasonably certain to occur in the future. *Hennekens v. Hoerl,* 160 Wis. 2d 144, 152, 465 N.W.2d 812 (1991). The discovery rule does not change these basic propositions, it simply defines some of the elements. That is, the discovery rule is so named because it tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person. Until that time, plaintiffs are not capable of enforcing their claims

either because they do not know that they have been wronged, *see Hansen,* 113 Wis. 2d at 550, or because they do not know the identity of the person who has wronged them, *see Borello,* 130 Wis. 2d at 406–07. Accordingly, " '[d]iscovery' in most cases is implicit in the circumstances immediately surrounding the original misconduct." *Borello,* 130 Wis. 2d at 404–05 n.2.

Given this understanding of the discovery rule, we conclude that the rule does not save Ms. Pritzlaff's claim. At oral argument, counsel for Ms. Pritzlaff admitted that the following statement, taken from the Archdiocese brief, was a correct statement of Ms. Pritzlaff's claim:

> [T]he plaintiff has claimed that despite the awareness of the tortfeasor and the alleged tortious acts, despite this awareness, she was unable to connect her knowledge of the acts with her emotional harm, that it wasn't until '92 that she connected her psychological, emotional difficulties.

Taking this allegation as true,[3] as we must for the purposes of this case, Ms. Pritzlaff still does not prevail. Ms. Pritzlaff, by her own admission, knew the identity of the tortfeasor and the conduct by the tortfeasor. Further, she claims that the sexual relation-

---

[3] "[I]t must be noted that the vast majority of priests and ministers of all religions lead responsible lifestyles above reproach. And a substantial percentage of allegations of clergy sexual abuse which do receive investigation, prove later to be retracted or impossible to prove. This has been the experience of the largest insuror of churches." James T. O'Reilly & Joann M. Strasser, *Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues,* 7 St. Thomas L. Rev. 31. 37 (1994) (footnotes omitted).

ship was "without her consent" and was a result of "force and coerc[ion]." Of course, she must allege this as fact because a consensual sexual relationship between two adults is no longer actionable in Wisconsin. *See* Sec. 768.01, Stats.;[4] *Koestler v. Pollard,* 162 Wis. 2d 797, 802–04, 471 N.W.2d 7 (1991) (abolition of claims under sec. 768.01, Stats. evinces a legislative intent that "dictates that courts should not administer heart balm in the form of civil liability"). However, if in fact the sexual acts were a product of "force and coerc[ion]", then the contact was immediately actionable as either a civil battery or an offensive bodily contact. *See* Wis. JI-Civil 2005; Wis. JI-Civil 2010 (approved 1960); *see also Marsha V. v. Gardner,* 231 Cal. App. 3d 265, 272–73 (Cal. App. 1991); *Doe v. R.D.,* 417 S.E.2d 541, 542 (S.C. 1992). Therefore, assuming her allegations are true, Ms. Pritzlaff could have alleged a complete cause of action against Fr. Donovan by the time the six year relationship ended.[5] That Ms. Pritzlaff was unaware of additional harm ("severe emotional distress") only created uncertainty as to the amount of damages and did not toll the period of limitations. *See Marsha V.,* 231 Cal. App. 3d at 273.

[4] Causes of action for breach of contract to marry, alienation of affections and criminal conversation which accrued after 1971 were abolished by sec. 768.01, Stats. Thus, any claim based upon these statutes is either abolished if it accrued in 1992 or untimely if it accrued earlier.

[5] Ms. Pritzlaff does not allege that she repressed what occurred. Therefore, even if she repressed the "coercive nature" of the relationship until 1992, Abrahamson, J., dissenting op. at 336, she did not repress the alleged fact that the sexual conduct was a result of "force" and was "without her consent." Forced sexual contact in and of itself causes actual damage.

In support of her claim that the discovery rule should apply, Ms. Pritzlaff relies primarily on *Byrne v. Bercker,* 176 Wis. 2d 1037, 501 N.W.2d 402 (1993). There, this court held that the plaintiff's claim was barred because, "it is undisputed, indeed it is acknowledged in plaintiff's brief, that plaintiff was aware by mid-1986 [more than two years before she commenced her action] that her difficulties stemmed from incestuous abuse by her father and that she had been told that she was the victim of the abuse and was not the perpetrator." *Byrne,* 176 Wis. 2d at 1046.

However, the *Byrne* court also stated its approval of the holding of the court of appeals in *Hammer v. Hammer,* 142 Wis. 2d 257, 418 N.W.2d 23 (Ct. App.), *rev. denied,* 144 Wis. 2d 257, 418 N.W.2d 23. (1987). Often cited nationally,[6] *Hammer* put the Wisconsin courts at the forefront of allowing claims of incest to proceed to trial long after the alleged events.[7]

In *Hammer,* a woman alleged that she was sexually abused by her father from the age five to age of fourteen (1969–78). *Hammer,* 142 Wis. 2d at 261. She reported the activity to her mother in 1978, but both her father and mother denied the conduct and trivialized it. *Id.* "He convinced Laura that she was not injured by the conduct but that she was at fault for her problems and for the family's problems." *Id.* The plain-

---

[6] *See e.g. Blackowiak v. Kemp,* 528 N.W.2d 247, 253 (Minn. App. 1995); *D.P. v. M.J.O.,* 640 N.E.2d 1323, 1327 (Ill. App. 1 Dist., 1994); *Weathers v. Fulgenzi,* 884 P.2d 538, 542 (Okla., 1994); *Farris v. Compton,* 652 A.2d 49, 63 n.24 (D.C. App., 1994); *Sawtell v. E.I. Du Pont De Nemours and Co., Inc.,* 22 F.3d 248, 250 n.6 (10th Cir., 1994).

[7] Comment, *Lemmerman v. Fealk: A "Reasonableness" Solution Allows Michigan's Incest Victims Greater Access to the Courts,* 71 U. Det. Mercy L. Rev. 943, 954 (1994).

tiff "alleged that during the course of the abuse, . . . she was unable to perceive or know the existence or nature of her psychological and emotional injuries. These manifestations continued to operate on her long after the incidents, . . . preventing her from perceiving her psychological and emotional injuries and their connection to her father's earlier acts." *Id.* at 261–62. She commenced suit in 1985. The court of appeals held "that a cause of action for incestuous abuse will not accrue until the victim discovers, or in the exercise of reasonable diligence should have discovered, the fact and cause of the injury." *Id.* at 264.

The *Hammer* decision was codified in 1987. Section 893.587, Stats. (1993–94) provides:

> **893.587 Incest; limitation.** An action to recover damages for injury caused by incest shall be commenced within 2 years after the plaintiff discovers the fact and the probable cause, or with the exercise of reasonable diligence should have discovered the fact and the probable cause, of the injury, whichever occurs first.

Thus, in cases alleging incest, a plaintiff may rely on the discovery rule to avoid a motion to dismiss on the pleadings where she alleges that she was unable to forge a connection between the abuse and her latent emotional injuries despite the exercise of reasonable diligence, even though the plaintiff does not allege that she repressed all memories of the abuse.

One aspect of *Hammer* gives us pause. The defendant in *Hammer* asserted that the statute of limitations should have begun to run because the plaintiff in that case discovered, or should have discovered, the injury when the abuse ended after she

319

reported it to her mother. *Hammer,* 142 Wis. 2d at 261, 267. The court of appeals dismissed this argument with one sentence, stating that a "claimant has leeway to not start an action until she knows more about the injury and its probable cause." *Id.* at 267 *(citing Borello,* 130 Wis. 2d at 420). However, the *Hammer* court took this statement by the *Borello* court out of context.

The *Borello* court cited this statement in explaining that the discovery rule had been informally recognized in at least one case prior to *Hansen. Borello,* 130 Wis. 2d at 420. That case was *Wisconsin Natural Gas v. Ford, Bacon & Davis Construction Corp.,* 96 Wis. 2d 314, 291 N.W.2d 825 (1980). There the plaintiff discovered a "casing short" in a pipeline installed by the defendant more than six years (the applicable statute of limitations) prior to commencing suit. *Id.* at 318–19. Based on testimony that such shorts are a "usual phenomena" and may result from factors other than improper pipeline installation, this court held that a single "casing short" did not give the plaintiff sufficient knowledge that the defendant had committed a tortious act, thus the statute of limitations did not begin to run at that point. *Id.* at 325. Instead, the statute of limitations began to run when the evidence of injury was "sufficiently significant to alert the injured party to the possibility of a defect." *Id.* Thus, the statement in *Borello* that a "claimant ha[s] leeway to not start action until it knows more about the injury and its probable cause," *Borello,* 130 Wis. 2d at 420, does not mean that a plaintiff can delay action until the extent of the injury is known, but only, consistent with the explanation of the discovery rule above, that the statute of limitations does not begin to run until the

plaintiff has sufficient evidence that a wrong has indeed been committed by an identified person.[8]

Moreover, the *Hammer* decision and its subsequent codification are best viewed as a specialized discovery rule applicable only to cases of incest. The rule focuses on the unique harms and relationships between the tortfeasor and victims which exist in cases of incest. For example, what is unfortunately a fairly typical fact scenario in incest cases was described in *Hammer*. There, the conduct occurred in secret and was accompanied by threats that harm would come to the victim if she ever told anyone about it and the victim was repeatedly told that she had caused the acts and that they were her fault. *Hammer*, 142 Wis. 2d at 261; *see also* Note, *The Statute of Limitations Barrier in Civil Suits Brought by Adult Survivors of Child Sexual Abuse: A Simple Solution*, 1994 U. Ill. L. Rev. 417, 421 (1994). Further, because of these relationships and types of factual situations, and because of the age of the victims, oftentimes victims do not realize the wrongfulness of the acts. Note, *Forging the Causal Link: Reasonable Delay in Commencing Action for Childhood Sexual Abuse*, 27 Suffolk U. L. Rev. 749, 760 n.55 (1993). Thus, for reasons of public policy, a special discovery rule has been created for these cases in an effort to provide adequate protection to children who "have been harmed because of a 'most egregious violation of the parent/child relationship.' " *Hammer*, 142 Wis. 2d

---

[8] This court was not faced with a similar potential defense in *Byrne* because there the plaintiff alleged that she had repressed all memory of the alleged abuse. *Byrne*, 176 Wis. 2d at 1039. Further, even if that defense had been presented, the legislative intent to codify the *Hammer* decision would have made such a defense untenable.

at 267 (*quoting* Comment, *Tort Remedies for Incestuous Abuse,* 13 Golden Gate U. L. Rev. 609, 631 (1983)).

But here sound public policy requires that the discovery rule should not save a claim under the facts of this case. This court has stated that the discovery rule will apply only when allowing meritorious claims outweighs the threat of stale or fraudulent actions. *Hansen,* 113 Wis. 2d at 559. Extending the discovery rule to this case would cause unfairness to a defendant who is forced to attempt to defend a suit for emotional and psychological injuries in which the alleged conduct took place over twenty-seven years ago and increase the potential for fraud.

Any time a claim is raised many years after the injury occurred, the potential for fraud is exacerbated. However, in most cases that potential is at least limited by the fact that the plaintiff is suffering from physical symptoms that a jury can see evidence of and which can be directly traced to the tortious conduct. For example, the IUD in *Hansen* caused pelvic inflammatory disease, and the furnace in *Borello* caused a myriad of respiratory problems. But here the alleged damages are all "emotional" and "psychological," with the plaintiff's experts claiming that damage exists and was caused by the defendant, and the defendant left in the position of attempting to prove either that the plaintiff is not "emotionally damaged" or that he is not the cause of that damage. "While some courts may have blind faith in all phases of psychiatry, this court does not." *Steele v. State,* 97 Wis. 2d 72, 97, 294 N.W.2d 2 (1980). "Nor are we convinced that even careful cross-examination in this esoteric and largely unproved field is likely to reveal the truth." *Id.*

Such circumstances are ripe for fraudulent claims even when the alleged cause of the injury occurred only weeks prior to the initiation of suit. When one adds to this that "this court has frequently been dismayed by the examination of trial court records which showed a marked propensity of those who purport to have psychiatric expertise to tailor their testimony to the particular client whom they represent," *id.*, fraud becomes a distinct possibility. Thus, unlike in *Hansen,* allowing what could be meritorious claims of this nature does not outweigh the threat of stale or fraudulent actions.

Although not relied upon by Ms. Pritzlaff, we feel it is necessary in order to fully explain the law related to this subject to distinguish this case from the closely analogous conduct prohibited by the sexual exploitation by a therapist statutes. Those statutes, enacted in 1985, provide in part:

> **895.70 Sexual exploitation by a therapist. (1)** DEFINITIONS. . . . (e) "Therapist" means a . . . member of the clergy . . . who performs or purports to perform psychotherapy.
>
> **(2)** CAUSE OF ACTION (a) Any person who suffers, directly or indirectly, a physical, mental or emotional injury caused by, resulting from or arising out of sexual contact with a therapist who is rendering or has rendered to that person psychotherapy, . . . has a civil cause of action against the psychotherapist . . . .
>
> **893.585 Sexual exploitation by a therapist. (1)** . . . an action under s. 895.70 for damages shall be commenced within 3 years after the cause of action accrues or be barred.

(2) If a person entitled to bring an action under s. 895.70 is unable to bring the action due to the effects of the sexual contact or due to any threats ... from the therapist, the period of inability is not part of the time limited for the commencement of the action, except that this subsection shall not extend the time limitation by more than 15 years.

These statutes may be somewhat in conflict with the discovery rule as described above. One possible reason for this is that this statute, like the incest statute, is designed to protect a class of persons who the legislature feels need special protection. People who consult therapists generally do so because they perceive that they have a mental or psychological problem and hope that the therapist has the means and the method to help them. The therapists have been the exponents of the theory that sexual exploitation can result in suppression of memory of such acts and psychological problems arising out of feelings of guilt that are suppressed and buried. The assumed fact that therapists are aware of such potential results leaves them with no excuse for using their professional position to obtain sexual gratification from their vulnerable patients. Thus, there is a rational basis for subjecting therapists to special statutory provisions in an attempt to reduce or eliminate such exploitation of their patients. Regardless of the reason for the statute, the limited scope of the statute supports the explanation of the discovery rule above. The legislature enacted the provision well after the discovery rule had been announced by this court. Therefore, its enactment demonstrates that the legislature concluded that the discovery rule would not apply to sexual exploitation by therapists absent legislative action.

Since we conclude that Ms. Pritzlaff's claim is time barred, we could end our analysis at this point. However, the question of whether a religious governing body is liable for negligence in hiring, retaining, training or supervising their "employees" (clergymen) who commit acts which are outside the scope of their employment is a matter of great public importance and has been fully briefed by the parties. *See In Matter of Guardianship of L.W.,* 167 Wis. 2d 53, 66, 482 N.W.2d 60 (1992) (issues of great public importance may be decided even if moot). Moreover, the decision of the court of appeals in this case is in conflict with a decision issued the same day by a different panel of the court of appeals. *Compare Pritzlaff v. Archdiocese of Milwaukee,* Appeal No. 93–1846 (Ct. App. Aug. 23, 1994) *with Jane Doe v. Archdiocese of Milwaukee,* Appeal No. 93–2074 (Ct. App. Aug. 23, 1994). Further, a number of cases of this sort are pending, both at circuit courts and at the court of appeals. *See In Matter of Guardianship of L.W.,* 167 Wis. 2d at 67 (issue may be decided although moot where the issue is likely to arise again and should be resolved by the court to avoid uncertainty). Thus, although the point is moot in this particular case, it is an issue which led this court to grant review in this case. Therefore, a decision is appropriate.

We conclude that even if Ms. Pritzlaff's claim were not time barred, it would still fail to state a claim against the Archdiocese upon which relief could be granted. Ms. Pritzlaff alleges that the Archdiocese was negligent in the hiring, training and supervision of Fr. Donovan. This court has not determined whether such a cause of action exists in Wisconsin. *See Midwest Knitting Mills, Inc. v. U.S.,* 950 F.2d 1295, 1298 (7th Cir., 1991). However, for purposes of this case we assume,

but do not decide, that it does,[9] and we look to other courts for the elements of the claim.

To establish a claim for negligent hiring or retention, Ms. Pritzlaff would have to establish that the Archdiocese was negligent in hiring or retaining Fr. Donovan because he was incompetent or otherwise unfit. *Id.* But, we conclude that the First Amendment to the United States Constitution prevents the courts of this state from determining what makes one competent to serve as a Catholic priest since such a determination would require interpretation of church canons and internal church policies and practices. Therefore, Ms. Pritzlaff's claim against the Archdiocese is not capable of enforcement by the courts.

The rationale for this rule was recently aptly summarized by a pair of commentators as follows:

> Examining the ministerial selection policy, which is 'infused with the religious tenets of the particular sect,' entangles the court in qualitative evaluation of religious norms. Negligence requires the court to create a 'reasonable bishop' norm. Beliefs in penance, admonition and reconciliation as a sacramental response to sin may be the point of attack by a challenger who wants a court to probe the tort-law reasonableness of the church's mercy toward the offender . . . . The tort of negligent selection of unsuitable teachers has been recognized in

---

[9] More precisely, we assume that the cause of action existed at the time of the alleged conduct by Fr. Donovan. *See Duncan v. Steeper,* 17 Wis. 2d 226, 116 N.W.2d 154 (1962) (court required to allow the defense of charitable immunity because the defense was recognized when the tort was committed); *Isley v. Capuchin Province,* 880 F. Supp. 1138, 1154 (E.D. Mich. 1995) (applying Wisconsin law to a delayed discovery claim).

civil courts. If negligent selection of a potential pedophile for the religious office of priest, minister or rabbi is a tort as to future child victims, will civil courts also hear Title VII challenges by the non-selected seminarian against the theological seminary that declines to ordain a plaintiff into ministry because of his psychological profile? How far shall the courts' qualitative entanglement with religious selectivity extend?

O'Reilly & Strasser, *supra,* at 47 (footnotes omitted).

Our conclusion is consistent with the principles enunciated by our founders as well as with nearly a century of United States Supreme Court jurisprudence. As Thomas Jefferson wrote in 1808, the government is "interdicted by the Constitution from intermeddling with religious institutions, their doctrines, discipline or exercises." O'Reilly & Strasser, *supra,* at 44 *(quoting* Letter of Thomas Jefferson to Reverend Samuel Miller (Jan. 23, 1808), in 5 Phillip Kurland & Ralph Lerner, *The Founders' Constitution* 98 (1987)). As early as 1929 the United States Supreme Court held that it is the function of church authorities to determine what the essential qualifications of a clergy person are and whether the candidate possesses them. *Gonzalez. v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16 (1929). More recently, the United States Supreme Court has stated, "[f]reedom to select the clergy . . . must now be said to have federal constitutional protection as part of the free exercise of religion against state interference." *Kedroff v. St. Nicholas Cathedral of Russian O. Ch.,* 344 U.S. 94, 116 (1952); *see also Rayburn v. General Conf. of Seventh Day Adventists,* 772 F.2d 1164, 1167–68 (4th Cir., 1985), *cert. denied* 478 U.S. 1020 (1986) (the right to choose clergy without government restriction underlies

327

the well-being of the religious community), *but see Moses v. Diocese of Colorado,* 863 P.2d 310, 320, 328 (Colo. 1993), *cert. denied,* 114 S.Ct. 2153 (1994) (First Amendment did not preclude negligent hiring claim where Diocese knew of priest's problems of depression, low self-esteem, and his struggle with his sexual identity).

Recent decisions of the courts of this state also support our conclusion that negligent hiring and retention claims cannot be heard by courts in this state for constitutional reasons. *See Olston v. Hallock,* 55 Wis. 2d 687, 696–97, 201 N.W.2d 35 (1972) (court could not constitutionally review a religious institution's decision to terminate a minister); *Black v. St. Bernadette Congregation,* 121 Wis. 2d 560, 565–66, 360 N.W.2d 550 (Ct. App. 1984) (matters of internal church government are at the core of ecclesiastical affairs and as such are beyond the province of judicial review); *see also Isley,* 880 F.Supp. at 1150–51 (E.D. Mich. applying Wisconsin law).

Although state inquiry into the training and supervision of clergy is a closer issue than inquiry into hiring and retention practices because under some limited circumstances such questions might be able to be decided without determining questions of church law and policies, it is nonetheless prohibited by the First Amendment under most if not all circumstances.[10] As

---

[10] Even if it were not, there is a possibility that Ms. Pritzlaff would not recover on her claim. At least one state has held that employers are not liable for failure to supervise when the employee engages in independent criminal conduct which results in the plaintiff's injuries. *See Tichenor v. Roman Catholic Church of New Orleans,* 32 F.2d 953, 960 (5th Cir., 1994) (explaining Miss. law).

one court stated in refusing to allow a claim for negligent supervision:

> [A]ny inquiry into the policies and practices of the church Defendants in hiring or supervising their clergy raises the same kinds of First Amendment problems of entanglement discussed above, which might involve the court in making sensitive judgments about the propriety of the church Defendants' supervision in light of their religious beliefs. . . . The traditional denominations each have their own intricate principles of governance, as to which the state has no right of visitation. Church governance is founded in scripture, modified by reformers over almost two millennia.
>
> . . .
>
> It would therefore also be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant Bishop. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause.

*Schmidt v. Bishop,* 779 F. Supp. 321, 332 (S.D.N.Y., 1991); *see also Roppolo v. Moore,* 644 So. 2d 206, 208 (La. App. 4 Cir. 1994) *(quoting* the United States Supreme Court decision in *Watson v. Jones,* 13 Wall. 679, 729, 20 L. Ed. 666 (1871)) (recognizing the threat of harassing lawsuits and a potential for a "chilling effect" on the free exercise of religion if the courts are to determine after the fact that ecclesiastical authorities negligently supervised or retained a member of the clergy).

329

We are aware of the fact that several courts have recently held that a religious governing body could be held liable for negligent supervision where the plaintiff alleges that the body knew that the individual clergyman was potentially dangerous. *See* O'Reilly & Strasser, *supra,* at 49–51 (collecting cases from New York, Colorado and Ohio). The rationale of these courts is summarized by the following quote from the Ohio Supreme Court, "even the most liberal construction of the First Amendment will not protect a religious organization's decision to hire someone who it knows is likely to commit criminal or tortious acts." *Byrd v. Faber,* 565 N.E.2d 584, 590 (Ohio, 1991). However, we find these cases unpersuasive, at least given the facts of this case.

Further, one state that recognizes the tort of negligent supervision provides that employers do not have a duty to supervise when the employees are off-duty or not working. *See Tichenor,* 32 F.3d at 960 (explaining Miss. law). Problems of excessive entanglement seem inevitable if the court is asked to determine whether a priest, minister or rabbi was on or off duty when he engaged in conduct that was against the laws of the religious denomination and beyond the scope of his employment.

In conclusion, our holding is limited to the following issues. We hold that Ms. Pritzlaff's claim against the Archdiocese is time barred. We further hold that, assuming they exist at all, the tort of negligent hiring and retention may not be maintained against a religious governing body due to concerns of excessive entanglement, and that the tort of negligent training or supervision cannot be successfully asserted in this case because it would require an inquiry into church laws, practices and policies. Therefore, we reverse that portion of the decision of the court of appeals which

remanded the case for a trial on the negligent supervision claim against the Archdiocese.

*By the Court.*—The decision of the court of appeals which remanded the case against the Archdiocese for a trial on the negligent supervision claim is reversed.

Justice JANINE P. GESKE took no part.

HEFFERNAN, CHIEF JUSTICE *(dissenting)*. I dissent because the majority apparently has misread the allegations of the plaintiff's complaint.

As the majority correctly states, plaintiff alleges, "... she has suppressed and been unable to perceive the existence ... of her psychological and emotional injuries until approximately April, 1992." (Majority opinion at 316).

The allegation is plain that she did not "perceive" her injuries until April of 1992. If this allegation is true, a matter that must eventually be decided at trial, she has brought her action within the period of limitations.[1]

The majority would object to this result because it relies on the discovery rule, i.e., that a cause of action does not accrue until the victim is not only aware of the injury but also must be aware of the cause of the injury.

That statement of the discovery rule is substantially correct, but the majority would insist that, because plaintiff alleges that she knew of the coerced

---

[1] We also point out that the explanation or supplementation of the claim at oral argument (see majority opinion at 317) is legally irrelevant at this stage of the proceedings. Neither party on oral argument in this court can amend its pleadings to either defeat or facilitate an order to dismiss. I believe it highly irregular to utilize the material referred to; and, of course, as pointed out, it is irrelevant.

sexual episode when it occurred and knew the identity of the tortfeasor, the cause of action accrued instanter. This overlooks the allegation that it was not until April of 1992 that she "perceive[d] the *existence* of her psychological and emotional injuries."

As I understand the complaint, it does not seek damages for whatever injury or trauma was occasioned at the time of the alleged sexual misconduct. It seeks damages for emotional and psychological harm which subsequently ensued and which could not be objectively associated with the original misconduct until decades later.

Thus the plaintiff alleges a harm of which she was unaware until 1992. Whether that allegation is in fact true must be decided by a factfinder not by a court on motion to dismiss. The majority opinion by its reference to the pleadings demonstrates that a material fact is in dispute.

The majority would further insist that the discovery rule, were it technically applicable, should, as a matter of public policy, not be applied to permit a litigant to get to a jury on so stale a claim. There is much philosophically to support the majority's position. Memories grow faint and proof is more difficult to produce as time passes, but the burden of proof is on the plaintiff and not upon the defendant. Also, the particular type of tort alleged is an emotionally charged one that may have a tendency to skew memories and stir old emotions. However, from a legal viewpoint, such problems can be handled by a factfinder, judge or jury, by appropriate instructions that caution a jury to be mindful that the lapse of time and the emotionally charged nature of the tort should be considered when evaluating evidence produced by either the plaintiff or

defendant, bearing in mind the proper allocation of the burden of proof.

I share the majority's skepticism of proof that may be offered in a case of this kind,[2] but that is not sufficient reason to ignore a claim which is actionable by the application of the discovery rule.

The majority urges that the bringing of a stale claim is contrary to public policy. Of course, all causes of action that rely on the discovery rule are, in the absence of that rule, stale claims. They are, however, not stale if they have accrued, as is alleged here, within the period of limitations. It is accepted as good public policy, as enunciated by the legislature, to allow claims to go forward if the claim has accrued, as appears from the face of the complaint, within the three-year period of limitations.

Moreover, as we stated in *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983), the discovery rule is to be applied to all cases except where the legislature has specifically provided otherwise. It has not done so in respect to the facts here. Rather than furthering public policy the majority contravenes the public policy determined by the legislature.

While I understand the sentiments of the majority, the position taken is legally insupportable. Accordingly I dissent.[3]

---

[2] The refreshing or stimulation of latent memories upon the goading of "therapists" is sometimes suspect. The possibility of suggesting a scenario to a disturbed and injured person should be carefully scrutinized by courts and juries, and it is the factfinder, usually the jury, who should pass upon the credibility of the evidence. It is not the function of this court to do so unless evidence presented is incredible as a matter of law.

[3] The dissenting opinion of Justice Abrahamson points out that Donovan's case is not before us. She also points out that the

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I dissent because I conclude, as did the court of appeals, that the factual dispute regarding the plaintiff's discovery of her claim against Donovan (the priest) should be determined at trial. I also conclude that the court should not, at this stage of the proceeding, decide the plaintiff's claims against the Archdiocese.

Before I proceed to discuss these issues, I must point out that this case is in an odd procedural posture. The court of appeals remanded the case for a full trial on the plaintiff's claims against Donovan. Donovan did not seek review in this court in a timely fashion. Only the Archdiocese sought review. After the time for the petition for review expired Donovan then petitioned this court to join the Archdiocese's petition for review. Because the time for his petition for review had expired and there was no procedure for extending that time, this court refused to allow Donovan to join in this review of the decision of the court of appeals. It would therefore appear that the cause of action against Donovan may proceed even after this decision. Should a circuit court absolve Donovan of liability, the plaintiff's claims against the Archdiocese necessarily fail. I therefore conclude that the majority opinion may very well be premature in deciding the cause of action against the Archdiocese.

With regard to the statute of limitations issue, the majority aptly acknowledges that the discovery rule "tolls the statute of limitations until the plaintiff discovers . . . that he or she has suffered actual damage . . . ." Majority op. at 316. The majority, however, deter-

---

majority reached the conclusion that therefore this action against the Archdiocese is barred. It seems to me that the appropriate disposition of this case, in view of its posture in this court, is to dismiss as improvidently granted.

mines that the rule does not apply in this case because it fails to apply the well-settled rule that courts liberally construe the allegations presented in the complaint and accept them as true for purposes of determining whether a claim is stated. *Paskiet v. Quality State Oil Co.,* 164 Wis. 2d 800, 805, 476 N.W.2d 867 (1991).

The plaintiff claims that her coping mechanisms prevented her from being able to perceive the actual damage caused by Donovan's alleged sexual advances until April 1992. She also alleges that Donovan used his position as a priest to coerce her into a sexual relationship. Accepting both of these allegations as true leads to the conclusion that the plaintiff was not cognizant of the coercive nature of the relationship until 1992. If, as the plaintiff asserts, she was unaware of actual damage until 1992, she could not have had a claim capable of enforcement in 1965, according to our prior cases.

Instead, the majority opinion states that sound public policy requires that the discovery rule is not applicable to the case. Majority opinion at 323. The majority suggests that claims of emotional and psychological injury are more easily subject to fraud than claims of physical injury. Majority op. at 324. Thus the majority opinion rests on grounds long discarded by this court in other cases. *See, e.g., Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis. 2d 627, 636–61, 517 N.W.2d 432 (1994) (discussing the history of the court's treatment of emotional distress in an action for negligent infliction of emotional distress).

The defendants counter Pritzlaff's claims in a more straightforward manner, suggesting that she could have discovered her injury and its cause at any time and that the statute of limitations therefore bars the

suit. As the court of appeals concluded, "[t]he factual impasse between Pritzlaff's knowledge of the events and her professed inability to relate them to her injuries presents a factual issue inappropriate for determination on a motion to dismiss. . . . Therefore, it was inappropriate for the trial court to dismiss the action without a full determination of the facts." *Pritzlaff v. Archdiocese of Milwaukee and Reverend John T. Donovan,* No. 93–1846, unpublished slip opinion at 7 (Wis. Ct. App. Aug. 23, 1994).

After deciding that the Archdiocese cannot be held liable because the statute of limitations bars the cause of action against Donovan, the court reaches out to discuss other issues that do not affect the decision of the case.

The court refuses to decide a straightforward issue of state tort law, that is whether the state recognizes a tort of negligence in hiring, retaining, training or supervising employees. But, the majority eagerly reaches out to decide a federal constitutional issue. The majority holds that if such a tort existed in this state, it would be barred in this case by the First Amendment. Thus the court engages in a "double reach."

The majority's reaching out to decide a First Amendment constitutional issue in this manner violates basic rules of judicial decisionmaking. A court will ordinarily not consider constitutional issues unless such a decision is essential to the determination of the question before the court. *State v. Hamilton,* 120 Wis. 2d 532, 540, 356 N.W.2d 169 (1984). The majority concedes that its determination of this claim is not essential. Majority op. at 326.

A court should be especially reluctant to volunteer to tackle a First Amendment issue relating to establishment of religion and the prohibition of the free

exercise of religion. It is generally acknowledged that this area of First Amendment law is in flux and the United States Supreme Court cases offer very limited guidance.

For the reasons set forth, I cannot join the majority opinion.