Kenneth SMITH

v.

Rev. William C. O'CONNELL, et al.

Michael KELLY

v.

Robert MARCANTONIO, et al.

Stephen KELLY

v.

Robert MARCANTONIO, et al.

Nos. 93–615–T, 93–660–T, 93–661–T.

United States District Court,
D. Rhode Island.

Nov. 25, 1997.

Richard Daniel Prentiss, McGovern, Noel & Benik, Providence, RI, Carl P. DeLuca, DeLuca & DeLuca, Providence, RI, Richard A. Cappalli, Woonsocket, RI, Timothy J. Conlon, Providence, RI, for Kenneth Smith.

Thomas R. Bender, William A. Curran, James T. Murphy, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, for William C. O'Connell, St. Mary's Church Corp.

Thomas R. Bender, James T. Murphy, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for Kenneth Angell, Daniel P. Reilly.

Thomas R. Bender, William A. Curran, James T. Murphy, Mark W. Dana, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for Louis A. Gelineau.

Thomas R. Bender, Hanson, Curran, Parks & Whitman, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for Church of the Holy Ghost North Tiverton.

Thomas R. Bender, James T. Murphy, Mark W, Dana, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for Roman Catholic Bishop of Providence.

Susan E. McGuirl, Richard C. Bicki, Cerilli, McGuirl & Bicki, Providence, RI, Lise M. Iwon, Laurence and Iwon, Wakefield, RI, for Michael Kelly, Stephen Kelly.

Gerald C. DeMaria, Paul S. Callaghan, Higgins, Cavanaugh & Cooney, Providence, RI, for Robert Marcantonio.

James T. Murphy, Mark W, Dana, Hanson, Curran, Parks & Whitman, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for Louis E. Gelineau.

William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for Daniel P. Reilly, St. John Vianney Church, Raymond A. Beaulieu.

### MEMORANDUM AND ORDER

TORRES, District Judge.

The plaintiffs in these consolidated cases seek to recover damages for sexual assaults allegedly committed by two Roman Catholic priests serving in the Diocese of Providence. The defendants are the priests, various diocesan officials and the churches where the alleged assaults occurred. The diocesan officials and the churches (collectively referred to as the "hierarchy defendants") have moved, under Fed.R.Civ.P. 12(b)(1) to dismiss the claims against them for lack of subject matter jurisdiction.

The issue presented is whether the First Amendment divests secular courts of jurisdiction over claims against officials of hierarchial churches where liability is predicated upon the officials' alleged failure to take appropriate action to prevent sexual assaults by clergy subject to their authority. Under the circumstances presented in this case, I answer that question in the negative. Accordingly, the motion to dismiss is denied.

### Background

It is neither necessary nor useful to provide a detailed account of the allegations set forth in the complaints or the multitude of legal theories upon which the plaintiffs' claims are based. Each complaint exceeds 100 pages, in length, and contains nineteen counts asserting causes of action that run the gamut from breach of fiduciary duty to premises liability. Some of the claims may raise legitimate First Amendment concerns and other claims may not be viable under negligence law. However, because the motions to dismiss are not directed specifically at individual counts, the Court will focus on what appear to be the plaintiffs' core claims.

At the heart of these cases are allegations that, during the 1970's and early 1980's, when the plaintiffs were minors, they were sexually molested by the defendant priests. It is further alleged, *inter alia*, that prior to such molestation, the hierarchy defendants knew that the priests were pedophiles and not only failed to take appropriate preventative action, but also actively concealed the priests' sexual misconduct.

The hierarchy defendants argue that the First Amendment bars adjudication of these claims for several reasons. First, they contend that entertaining these suits would constitute the kind of interference with the internal affairs of a hierarchical church that is prohibited by what the hierarchy defendants call the "religious autonomy doctrine". In addition, the hierarchy defendants assert that holding them liable for failing to conform to tort law standards of conduct would infringe upon their First Amendment rights because those standards conflict with the standards established by Roman Catholic doctrine and practices. Finally, the hierarchy defendants suggest that litigating these claims would require the Court to become "excessively entangled" in religious matters.

### Rule 12(b)(1) Standard

When subject matter jurisdiction is challenged, the plaintiff has the burden of establishing that jurisdiction exists. *Bank One, Texas, N.A. v. Montle,* 964 F.2d 48, 50 (1st Cir.1992). In determining whether that burden has been met, the Court, initially, must treat all of the well-pleaded facts alleged in the complaint as true and must draw all reasonable inferences favorable to the plaintiff. *Murphy v. United States,* 45 F.3d 520, 522 (1st Cir.), *cert. denied,* 515 U.S. 1144, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995). However, in contrast to a Rule 12(b)(6) motion to

dismiss for failure to state a claim, the Court, in deciding a Rule 12(b)(1) motion, is not limited to the allegations in the complaint. Evidence challenging and/or supplementing the jurisdictional allegations also may be considered. *Aversa v. United States,* 99 F.3d 1200, 1210 (1st Cir.1996); *see* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.30[3] (3d ed.1997).

In these cases, the complaints allege sufficient facts to establish subject matter jurisdiction. The hierarchy defendants' jurisdictional challenge is based upon several affidavits describing religious doctrines and practices of the Roman Catholic Church. The plaintiffs have been afforded an opportunity to conduct discovery with respect to those doctrines and practices but have not challenged the statements contained in the affidavits.

### *Discussion*

### I. *The "Religious Autonomy Doctrine"*

■ It is well established that the First Amendment prohibits secular courts from intervening in the internal affairs of hierarchical churches by deciding what, essentially, are religious matters. *See, e.g., Serbian E. Orthodox Diocese for the United States and Canada v. Milivojevich,* 426 U.S. 696, 708–10, 96 S.Ct. 2372, 2380–81, 49 L.Ed.2d 151 (1976); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969). The hierarchy defendants refer to this principle as the "religious autonomy doctrine."

This prohibition derives from cases arising out of disputes between parties within a church in which an interpretation of ecclesiastical law or church doctrine was required. For example, in *Milivojevich* it was held that the First Amendment barred a state court from invalidating, as arbitrary, the removal of a Serbian Orthodox Bishop by an ecclesiastical court. The court stated:

> [C]ivil courts are bound to accept the decisions of the highest judiciaries of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else in to the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

*Milivojevich,* 426 U.S. at 713, 96 S.Ct. at 2382.

Similarly, in *Presbyterian Church,* it was held that a civil court had no authority to decide whether local churches that withdrew from a hierarchical church organization were entitled to property previously used by the local churches because resolution of the dispute turned upon whether the hierarchical church had abandoned or departed from its tenets of faith and practice. The Court explained that:

> First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.... [T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

*Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. at 606.

Most, if not all, of the other cases citing the so-called "religious autonomy doctrine" as a bar to jurisdiction also have dealt either with challenges by clergy to disciplinary action taken against them, *see Natal v. Christian and Missionary Alliance,* 878 F.2d 1575 (1st Cir.1989); *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.), *cert. denied,* 479 U.S. 885,

107 S.Ct. 277, 93 L.Ed.2d 253 (1986), or with disagreements among factions within a church regarding the ownership or possession of church property, *see Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601; *Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Moreover,.in each case, resolution of the dispute would have required the Court to interpret what, essentially, was a religious doctrine or ecclesiastical law.

These cases do not stand for the proposition that a secular court lacks jurisdiction over a case simply because it involves a dispute over church property or because it calls into question the conduct of someone who is a church official. They hold only that the First Amendment prohibits judicial interference with internal church matters that require an interpretation of religious doctrine. In the words of the *Presbyterian Church* Court:

> [N]ot every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.

*Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. at 606.

■ In this case, the matter at issue is not an *internal* church matter. What is alleged is that church officials conducted themselves in a manner that allowed several minors to be sexually abused. The dispute is not one between factions within the church or between the church and its clergy or employees. Rather, it is a dispute between church officials and third persons who allege that they were seriously injured by the negligence of the church officials. Such a dispute hardly can be characterized as a dispute involving an *internal* church matter.

Nor does this dispute turn on interpretations of religious doctrine or ecclesiastical law. Determining whether the hierarchy defendants negligently failed to take appropriate preventative action is a matter governed by tort law. Making that determination will not require the Court to resolve any "controversies over religious doctrine and practice." *Id.*

In short, the so-called "religious autonomy doctrine" does not divest the Court of jurisdiction over this case, at least insofar as the plaintiffs' core claims are concerned. That brings the Court to the next question which is whether the application of tort law principles would interfere with the hierarchy defendants' free exercise rights.

## II. *The Free Exercise Clause*

■ The First Amendment prohibits Congress from making any "law respecting an establishment of religion or prohibiting the free exercise thereof...." Const. Amend. I. The Fourteenth Amendment makes that prohibition equally applicable to the states. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113, S.Ct. 2217, 2225, 124 L.Ed.2d 472 (1993) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)); *Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). Moreover, the prohibition extends to common law provisions as well as statutory enactments. *See, e.g., Natal*, 878 F.2d at 1576–77 (free exercise clause prohibits clergy member from maintaining wrongful termination action against church).

In this case, the hierarchy defendants argue, in essence, that subjecting them to potential tort liability would infringe on their free exercise rights because conforming to the standard of conduct that tort law demands of employers would require them to deviate from "church doctrine." That argument rests on two premises. The first is that the standards to which an employer must adhere in order to avoid tort liability for the acts of an employee conflict with the duties imposed on the hierarchy defendants by Roman Catholic doctrine. The second premise is that, to the extent that the hierarchy defendants' conduct was religiously moti-

vated, the free exercise clause insulates them from civil liability. Neither of these premises withstands scrutiny.

### A. Re the Alleged Conflict Between Tort Law and Church Doctrine

■ A law establishing standards of conduct does not implicate the free exercise clause unless adherence to those standards interferes with some religious activity. *Lukumi Babalu Aye,* 508 U.S. at 532, 113 S.Ct. at 2226. Accordingly, the threshold inquiry is whether there is a conflict between conduct that is required by the law and conduct that is prescribed or prohibited by religious principles.

Here, there is no indication that the reasonably prudent person standard established by tort law and the requirements of Roman Catholic doctrine are incompatible. The hierarchy defendants do not claim that the Roman Catholic Church either condones or tolerates sexual abuse of children. On the contrary, they have made it clear that the Catholic Church considers such conduct to be opprobrious. Rather, the hierarchy defendants argue that the two standards of conduct conflict because church doctrine restricts their ability to take the kind of preventative action required by tort law.

In support of that argument, the hierarchy defendants have submitted several affidavits describing the limitations that canon law places upon their authority to *discipline* priests. However, nothing in those affidavits suggests that canon law precludes hierarchical officials from taking appropriate action to *prevent* priests, who are known pedophiles, from sexually abusing children. The affidavits make no reference to any limitation on the Bishop's power to determine a priest's assignment or to closely monitor and supervise the priest's activities. On the contrary, the affidavit of Father Morrisey states that, when appropriate proof of sexual abuse is obtained, "the bishop may ... [temporarily] restrict [a priest's] right to function as a priest so as to protect the common good...." (Morrisey Aff. ¶ 31.) In addition, the affidavit states that the Bishop is empowered to "issue a specific directive to the cleric suspected of misconduct to avoid particularly described circumstances, such as participating in group activities with children." (*Id.* ¶ 33.)

The affidavits also refer to the belief in redemption and the forgiveness of sin as fundamental precepts of the Catholic faith that prohibit church officials from summarily taking action to *punish* priests who sexually abuse children. However, once again, there is nothing to indicate that these principles preclude action that would *prevent* such abuse.

Finally, the affidavits describe the restrictions that canon law places on disclosure of "confidential" information revealed during "confession"; "internal forum" (i.e., discussions regarding matters upon which moral or spiritual guidance is sought) or investigations with respect to clerical misconduct. However, the affidavits fail to explain how that prohibition would have prevented the hierarchy defendants from exercising reasonable care to prevent priests under their jurisdiction from sexually abusing children.

The affidavits do not assert that the hierarchy defendants, in fact, receive any "confidential" information relevant to these cases. Even if it was assumed that such information was received, the affidavits do not establish that the prohibition against disclosure barred the hierarchy defendants from considering it for the limited purpose of determining whether preventative measures were warranted.

The hierarchy defendants appear to suggest that the obligation of confidentiality impairs their ability to defend against the plaintiffs' claims; but, once again, they do not explain how. Indeed, with the possible exception of the failure to warn claim, it is difficult to see any way that tort liability could be predicated upon the hierarchy defendants' past failure to reveal any "confidential" information that they may have received. Moreover, the priest penitent privilege makes it doubtful that any "confidential" information received by the hierarchy defendants could be obtained through discovery or presented at trial. *See* Fed. R.Evid. 501; R.I. Gen. Laws § 9–17–23.

It is equally difficult to see how the hierarchy defendants would be prejudiced by any present inability to disclose "confidential" information previously imparted to them. Since any such information presumably would relate to alleged misconduct by the priests, it is unlikely that the information would be helpful in defending against the plaintiffs' claims.

Briefly stated, there is no indication that, by taking the kind of preventative action required by tort law, the hierarchy defendants would have violated any "doctrine, practice or law" of the Roman Catholic Church. In the absence of such a conflict, subjecting the hierarchy defendants to potential tort liability does not violate their right to the free exercise of their religion.

### B. *Re Neutral Laws of General Application*

■ Even if it is assumed, *arguendo*, that tort law and canon law prescribe incompatible standards of conduct for preventing priests from sexually abusing minors, this Court would not necessarily be deprived of subject matter jurisdiction. The hierarchy defendants argue, in essence, that holding them civilly liable for their alleged failure to adhere to common law negligence standards would violate their free exercise rights because it would punish them for acting in accordance with church doctrine.

■ That argument overlooks the distinction between the freedom to hold a religious belief and the freedom to act in accordance with that belief. Both freedoms are protected by the free exercise clause. However, the freedom to believe is absolute but the freedom to act upon those beliefs is not. *Smith,* 494 U.S. at 877–79, 110 S.Ct. at 1599–1600; *Moses v. Diocese of Colo.,* 863 P.2d 310, 319 (Colo.1993) (*citing Cantwell,* 310 U.S. at 303–04, 60 S.Ct. at 903), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994).

■ This distinction is reflected in the well-established principle that neutral laws of general application do not violate the First Amendment simply because they have the incidental effect of burdening a particular religious practice. *City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624 (1997); *Lukumi Babalu Aye,* 508 U.S. at 531, 113 S.Ct. at 2226; *Smith,* 494 U.S. at 882, 110 S.Ct. at 1602. Indeed, such laws have been upheld even in the absence of any showing that they serve some compelling governmental interest.[1] *Smith,* 494 U.S. at 885, 110 S.Ct. at 1603.

In *Smith,* the Supreme Court expressly rejected the argument that the First Amendment protects all conduct prompted by religious beliefs. *Id.* at 882, 110 S.Ct. at 1602. The *Smith* Court held that the free exercise clause does not prevent a state from applying criminal laws prohibiting drug use to smoking peyote during a religious rite. The Court stated:

> Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation. We have never held that, and decline to do so now.

*Id.*

*Smith* recognized that the free exercise clause prohibits a state from regulating conduct because of the religious beliefs that it represents. However, the Court declined to extend that prohibition to neutral laws of general application merely because they establish standards of conduct that conflict with a particular religious belief.

> Respondents in the present case, however, seek to carry the meaning of "prohibiting the free exercise [of religion]" one large step further. They contend that their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practice, and that is concededly constitutional as applied to those who use the drug for other reasons. They assert, in other words, that "prohibiting the free exercise [of religion]" includes requiring

---

**1.** If a law is not religiously neutral and of general application, it must be shown to serve a compelling governmental interest and to be narrowly tailored to advance that interest. *Lukumi Babalu Aye,* 508 U.S. at 531–32, 113 S.Ct. at 2226.

any individual to observe a generally applicable law that requires (or forbids) the performance of an act that his religious belief forbids (or requires). As a textual matter, we do not think the words must be given that meaning.

*Id.* at 878, 110 S.Ct. at 1599.

As explained in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), "[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees or purchase goods." *Id.* at 606, 99 S.Ct. at 3027.

If, as the hierarchy defendants urge, conduct is put beyond the reach of secular laws merely because it is based upon a religious doctrine or practice, the result would be what has been termed an unacceptable "anomaly in the law, a constitutional right to ignore neutral laws of general applicability." *Boerne,* —— U.S. at ——, 117 S.Ct. at 2161 (citing *Smith,* 494 U.S. at 887, 110 S.Ct. at 1604).

It is easy to envision the kinds of "anomalies" that could result from such an absolutist interpretation of the free exercise clause. For example, laws prohibiting murder would have no application to human sacrifices performed pursuant to some religious practice.

Clearly, the framers of our Constitution did not intend religious liberty to extend that far. Indeed, permitting some individuals to engage in conduct proscribed by neutral laws that must be observed by everyone else simply because that conduct emanates from a religious belief might be viewed as the kind of official recognition of a religion that is prohibited by the establishment clause. *See Boerne,* —— U.S. at ——, 117 S.Ct. at 2172 (Stevens, J., concurring).

In this case, there is no question that the principles of tort law, at issue, are both neutral and generally applicable. It is not even alleged that they are directed at or were designed to suppress the religious practices of the Roman Catholic Church or that they selectively burden religiously-inspired conduct. *Cf. Lukumi Babalu Aye,* 508 U.S. at 545–46, 113 S.Ct. at 2233 (holding ordinance prohibiting animal sacrifice unconstitutional because it was motivated by a desire to suppress the practices of a particular religion and did not apply equally to the killing of animals for non-religious purposes). On the contrary, it is clear that these principles have evolved without regard to the practices of any religion and that they are uniformly applicable whether the conduct in question is religiously inspired or not. Consequently, judging the hierarchy defendants' liability in accordance with these principles does not violate their free exercise rights.

## III. *Excessive Entanglement*

■ The hierarchy defendants cite a number of decisions holding that the First Amendment divests a court of jurisdiction over claims against church officials arising out of sexual misconduct by their clergy. *See, e.g., Schmidt v. Bishop,* 779 F.Supp. 321, 332 (S.D.N.Y.1991); *Swanson v. Roman Catholic Bishop of Portland,* 692 A.2d 441, 445 (Me.1997); *Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis.2d 302, 533 N.W.2d 780, 790 (1995), *cert. denied,* 516 U.S. 1116, 116 S.Ct. 920, 133 L.Ed.2d 849 (1996). However, there is a split of authority on this issue.

Some courts have found jurisdiction lacking on the ground that adjudication of the claims would require interpretation of church doctrine. *See, e.g., Schmidt,* 779 F.Supp. at 332 (First Amendment prevents courts from adjudicating claims of negligent hiring/supervision because courts may be required to make "sensitive judgments" about supervision of clergy in light of religious beliefs); *Pritzlaff,* 533 N.W.2d at 790 (First Amendment bars negligent hiring claim because determining what makes one competent to serve as priest requires interpretation of church doctrine and practices); *H.R.B. v. J.L.G.,* 913 S.W.2d 92, 99 (Mo.Ct.App.1995) (First Amendment bars breach of fiduciary duty claim against church because Court must inquire into religious aspects of relationship between church authorities and parishioner); *see also Swanson,* 692 A.2d at 445 (First Amendment bars negligent supervision claim because use of civil standard conflicts

with standard established by ecclesiastical authorities).

Some of these courts have employed what appears to be an establishment clause analysis. Thus, they express concern that adjudicating such claims would result in "excessive entanglement" between church and state. *See, e.g., Schmidt,* 779 F.Supp. at 332; *L.L.N. v. Clauder,* 209 Wis.2d 674, 563 N.W.2d 434, 440 (1997). Others have applied the "religious autonomy" cases' admonition against deciding "religious matters." *See, e.g., Isely v. Capuchin Province,* 880 F.Supp. 1138, 1150 (E.D.Mich.1995); *Swanson,* 692 A.2d at 444–45; *Pritzlaff,* 533 N.W.2d at 791. In either event, the implicit assumption of these cases is that the interpretation of church doctrine is necessary to determine liability.

On the other hand, a number of courts have upheld jurisdiction on the ground that such claims can be adjudicated by applying neutral principles of law and do not require any interpretation of church doctrine. *See, e.g., Doe v. Hartz,* 970 F.Supp. 1375, 1431–32 (N.D.Iowa 1997) (First Amendment does not bar negligent supervision claim against church defendants because claim can be assessed applying neutral principles of law); *Isely,* 880 F.Supp. at 1151 (court has jurisdiction to decide negligent supervision claim because " 'neutral' principles of law can be applied without determining underlying questions of church law and policies"); *Moses,* 863 P.2d at 320–21 (First Amendment does not bar suit against hierarchy defendants for negligent hiring/supervision and breach of fiduciary duty because deciding claims does "not require interpreting or weighing church doctrine and neutral principles of law can be applied."); *see also Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927, 931 (N.Y.Sup.Ct.1992) (because it is "conduct, and not creed, that underlies plaintiffs' actions," First Amendment does not bar negligent hiring/supervision action against church officials where it is alleged that officials knew or should have known that priest was likely to commit sexual abuse and yet placed him in position where he could commit such acts).

In general, this Court finds the cases upholding jurisdiction to be more persuasive. Arguably, there might be some circumstances under which it could be difficult to determine the tort liability of church officials for the sexual misconduct of clergy without first deciding questions of religious doctrine. For example, when such a claim rests on a breach of fiduciary duty theory, an examination of church doctrine might be required in order to ascertain the nature of any fiduciary relationship between the church officials and the victim. In fact, there is a split of authority on this precise question. *Compare H.R.B.,* 913 S.W.2d at 98–99 (First Amendment bars fiduciary duty claims because their adjudication inevitably requires inquiry into the religious aspects of the relationship between priests, parishes, dioceses and parishioners), *with Moses,* 863 P.2d at 321 (First Amendment does not bar plaintiff's claims, including breach of fiduciary duty claim, because court is not required to interpret or weigh church doctrine).

█ In this case, although breach of fiduciary duty is one of a multitude of claims made by the plaintiffs, there is no need to analyze every one of those claims for the purpose of determining whether they require an interpretation of church doctrine. As already noted, the motion to dismiss amounts to a general challenge to the Court's subject matter jurisdiction and is not directed at particular claims. Moreover, the plaintiffs' core claim, namely, that the hierarchy defendants failed to take appropriate action to prevent the alleged sexual assaults, is governed by neutral tort law principles of general application. More specifically, Rhode Island law recognizes that an employer may be liable for the misconduct of an employee attributable to the employer's negligent failure to supervise the employee. *See Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436, 441 (R.I.1984).

Here, adjudication of, at least, the negligent supervision claim does not require any interpretation of religious doctrine. A determination with respect to whether the hierarchy defendants exercised reasonable care in supervising the priests subject to their authority can be made solely in accordance with well established tort law principles. Unlike some breach of fiduciary duty claims, there is no need to interpret church doctrine in order to establish the nature of the duty owed to the plaintiffs. Consequently, it is unlikely

that exercising jurisdiction over this case will result in any "excessive entanglement" between church and state.

### Conclusion

For all of the foregoing reasons, the hierarchy defendants' motion to dismiss for' lack of subject matter jurisdiction is denied.

IT IS SO ORDERED,