# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2020AP2007

†Petition for Review Filed

Complete Title of Case:

> **CATHOLIC CHARITIES BUREAU, INC., BARRON COUNTY
> DEVELOPMENTAL SERVICES, INC., DIVERSIFIED SERVICES, INC.,
> BLACK RIVER INDUSTRIES, INC. AND HEADWATERS, INC.,**
>
> > **PETITIONERS-RESPONDENTS,†**
>
> > **V.**
>
> **STATE OF WISCONSIN LABOR AND INDUSTRY REVIEW COMMISSION,**
>
> > **RESPONDENT-CO-APPELLANT,**
>
> **STATE OF WISCONSIN DEPARTMENT OF WORKFORCE DEVELOPMENT,**
>
> > **RESPONDENT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | February 14, 2023 |
| Submitted on Briefs: | |
| Oral Argument: | August 3, 2022 |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Gill, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the respondent-appellant, the cause was submitted on the briefs of *Christine L. Galinat* of *Department of Workforce Development*.  There was oral argument by *Jeffrey J. Shampo* of *Department of Labor and Industry Review Commission*. |

Respondent
ATTORNEYS:          On behalf of the petitioners-respondents, the cause was submitted on the brief of and oral argument by *Kyle Torvinen* of *Torvinen, Jones, Routh & Saunders, S.C.*, Superior.

COURT OF APPEALS
DECISION
DATED AND FILED

February 14, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP2007**

Cir. Ct. No. 2019CV324

STATE OF WISCONSIN

IN COURT OF APPEALS

CATHOLIC CHARITIES BUREAU, INC., BARRON COUNTY DEVELOPMENTAL SERVICES, INC., DIVERSIFIED SERVICES, INC., BLACK RIVER INDUSTRIES, INC. AND HEADWATERS, INC.,

PETITIONERS-RESPONDENTS,

V.

STATE OF WISCONSIN LABOR AND INDUSTRY REVIEW COMMISSION,

RESPONDENT-CO-APPELLANT,

STATE OF WISCONSIN DEPARTMENT OF WORKFORCE DEVELOPMENT,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Douglas County: KELLY J. THIMM, Judge. *Reversed.*

Before Stark, P.J., Hruz and Gill, JJ.

¶1 STARK, P.J. This unemployment insurance case requires us to determine the proper interpretation of the religious purposes exemption under WIS. STAT. § 108.02(15)(h)2. (2019-20).[1] The petitioner-respondents are the Catholic Charities Bureau, Inc. (CCB) as well as four of its sub-entities: Barron County Developmental Services, Inc.; Diversified Services, Inc.; Black River Industries, Inc.; and Headwaters, Inc.[2] CCB asserts that it is exempt from Wisconsin's Unemployment Compensation Act under § 108.02(15)(h)2. because it is "operated primarily for religious purposes." In considering whether it is exempt under the statute, CCB argues that the proper consideration is whether it is operated primarily for a religious *motive* or *reason*.

¶2 Conversely, the Department of Workforce Development (DWD) and the Labor and Industry Review Commission (LIRC)[3] contend that whether CCB is operated primarily for religious purposes depends on whether its *activities* are primarily religious in character. The parties also dispute whether the religious purposes exemption is ambiguous and, if so, how that ambiguity should be resolved. Finally, both CCB and DWD argue, albeit for different reasons, that adopting the opposing party's interpretation of the religious purposes exemption will violate the First Amendment to the United States Constitution.

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] For ease of reading, we will refer to CCB and its sub-entities collectively as CCB when referring to their arguments made on appeal, unless referring to the sub-entities individually. Otherwise, we refer to them as CCB and its sub-entities.

[3] DWD filed a brief in this appeal, and LIRC filed a letter indicating that it concurred with the arguments raised in DWD's brief and would not be submitting a separate brief. For ease of reading, we will therefore refer to the appellants as DWD throughout, unless referring to LIRC's decision.

¶3 For the reasons that follow, we conclude that the reviewing body must consider the nonprofit organization's motives *and* activities to determine whether that organization is "operated primarily for religious purposes" under WIS. STAT. § 108.02(15)(h)2., such that the religious purposes exemption to unemployment taxation applies. We further determine that the First Amendment is not implicated in this case. Given the facts here, we conclude that LIRC correctly determined that CCB and its sub-entities are not organizations operated primarily for religious purposes; thus, employees of the organizations do not perform their services under excluded employment as that is defined under § 108.02(15)(h)2. We therefore reverse the circuit court's order and reinstate LIRC's decision.[4]

## BACKGROUND

¶4 The facts of this case are undisputed. Every Roman Catholic diocese in Wisconsin has a Catholic Charities entity that functions as the diocese's social ministry arm. Catholic Charities' stated mission is "to provide service to people in need, to advocate for justice in social structures and to call the entire church and other people of good will to do the same." During the administrative proceedings in this case, Archbishop Jerome Listecki testified that this mission is "rooted in scripture," which "mandate[s]" that the Catholic Church "serve the poor." According to Archbishop Listecki, inherent in the church's teachings is a "demand" that Catholics respond in charity to those in need.

¶5 CCB is the Catholic Charities entity for the Diocese of Superior, Wisconsin. CCB's statement of philosophy provides that the "purpose" of CCB is

---

[4] This opinion was first released on December 13, 2022. Subsequently, on our own motion, we withdrew our prior opinion on February 9, 2023, which was within the deadline provided under WIS. STAT. RULE 809.24(3).

3

"to be an effective sign of the charity of Christ" by providing services that are "significant in quantity and quality" and are not duplicative of services already adequately provided by public or private organizations. CCB provides these services according to an "Ecumenical orientation," such that "no distinctions are made by race, sex, or religion in reference to clients served, staff employed and board members appointed."

¶6 Under CCB's umbrella, numerous separately incorporated nonprofit sub-entities operate sixty-three "programs of service," which provide aid "to those facing the challenges of aging, the distress of a disability, the concerns of children with special needs, the stresses of families living in poverty and those in need of disaster relief." As noted above, four of those sub-entities are at issue in this appeal.

¶7 Barron County Developmental Services, Inc. (BCDS) is a "[c]ommunity rehabilitation program providing services to individuals with developmental disabilities" that focuses "on the development of vocational and social skills that allow a person to reach their highest potential within the community." BCDS contracts with DWD's Division of Vocational Rehabilitation (DVR) to perform job placement, job coaching, and other employment services to assist individuals with disabilities to obtain employment in the community. BCDS is funded "primarily" through government funding via DVR, but it also receives some funding from private companies. It receives no funding from the Diocese of Superior. BCDS was formerly known as Barron County Developmental Disabilities Services, but in December 2014, its board of directors "requested to become an affiliate agency" of CCB and its name was changed. Prior to becoming a sub-entity of CCB, BCDS had no religious affiliation. The type of services and programming provided by the organization did not change after it became affiliated with CCB.

¶8 Black River Industries, Inc. (BRI) provides "in-home services, community-based services, and facility-based services" to individuals with developmental disabilities, mental health disabilities, and limited incomes. To serve those in need, BRI works with DVR to provide participants with job training skills; it provides transportation services to disabled adults and seniors; it has a contract with Taylor County to provide mental health services; and it has a food service production facility, a paper shredding program, and a mailing services program to serve the community and provide job training. "[M]uch" of BRI's funding comes from government organizations, including "county services, Department of Health Services, Long-Term Care Division[,] as well as" DVR. BRI receives no funding from the Diocese of Superior.

¶9 Diversified Services, Inc. (DSI) provides services to individuals with developmental disabilities. To do so, DSI offers "meaningful employment opportunities" to these individuals and also hires individuals without disabilities to do production work. Most of DSI's funding comes from Family Care, a Medicaid long-term care program, and from private contracts. DSI receives no funding from the Diocese of Superior.

¶10 Headwaters, Inc., provides "various support services for individuals with disabilities," including "training services related to activities of daily living," employment-related training services, and job placement. In addition, Headwaters has work-related contracts for individuals to learn work skills while earning a paycheck; provides Head Start home visitation services to eligible families with children; and provided birth-to-three services before Tri-County Human Services assumed providing those services. The majority of Headwaters' funding comes from government grants, and it too receives no funding from the Diocese of Superior.

¶11 CCB's role is to provide management services and consultation to its sub-entities, establish and coordinate the sub-entities' missions, and approve capital expenditures and investment policies. CCB's executive director, who is not required to be a Catholic priest, oversees each sub-entity's operations. Nonetheless, CCB's internal organizational chart establishes that the bishop of the Diocese of Superior oversees CCB in its entirety, including its sub-entities, and is ultimately "in charge of" CCB. New CCB employees are provided with CCB's mission statement, statement of philosophy, and code of ethics, and they are informed that their employment "is an extension of Catholic Social Teachings and the Catechism of the Church." Employees of CCB and its sub-entities are not required to be members of the Catholic faith, but they are prohibited from engaging in activities that violate Catholic social teachings.

¶12 As noted above, CCB's sub-entities provide services to all people in need, regardless of their religion, pursuant to the Catholic social teaching of "Solidarity," which is a belief that "we are our brothers' and sisters' keepers, wherever they live. We are one human family." Program participants are not required to attend any religious training or orientation to receive the services that CCB's sub-entities provide. Neither CCB nor its sub-entities engage in devotional exercises with their employees or program participants nor do they disseminate religious materials to those individuals, except for providing new hires with the CCB mission statement and code of ethics and philosophy. Neither CCB nor its sub-entities "try to inculcate the Catholic faith with program participants."

¶13 CCB became subject to Wisconsin's Unemployment Compensation Act, WIS. STAT. ch. 108, in 1972, following CCB's submission of an employer's report stating that the nature of its operations was charitable, educational, and

rehabilitative.[5]    CCB's sub-entities report their employees under CCB's unemployment insurance account.  In 2015, a Douglas County Circuit Court judge ruled that Challenge Center, Inc.—another CCB sub-entity providing services to developmentally disabled individuals—was operated primarily for religious purposes and was therefore exempt from the Unemployment Compensation Act under the religious purposes exemption, WIS. STAT. § 108.02(15)(h)2.  CCB and the four sub-entities at issue in this appeal then sought a determination from DWD that they, too, were exempt.

¶14    DWD determined that CCB and the sub-entities did not qualify for the religious purposes exemption.    CCB sought administrative review of that determination, and an administrative law judge (ALJ) reversed, concluding that CCB and the sub-entities qualified for the exemption because they were operated primarily for religious purposes.  DWD appealed to LIRC, which reversed the ALJ's decision.  CCB then sought judicial review, and the circuit court again reversed, agreeing with the ALJ that CCB and the sub-entities qualified for the exemption. DWD appeals.

---

[5] CCB and its sub-entities are exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code under a group exemption.  The group exemption includes "the agencies and instrumentalities and the educational, charitable, and religious institutions operated by the Roman Catholic Church in the United States, its territories, and possessions" that are subordinate to the United States Conference of Catholic Bishops.

**DISCUSSION**

¶15    "Wisconsin's unemployment compensation statutes embody a strong public policy in favor of compensating the unemployed." *Operton v. LIRC*, 2017 WI 46, ¶31, 375 Wis. 2d 1, 894 N.W.2d 426.  When the Wisconsin Legislature enacted the Unemployment Compensation Act, it recognized that unemployment in Wisconsin is "an urgent public problem, gravely affecting the health, morals and welfare of the people of this state.  The burdens resulting from irregular employment and reduced annual earnings fall directly on the unemployed worker and his or her family."  WIS. STAT. § 108.01(1).  The legislature acknowledged that "[i]n good times and in bad times unemployment is a heavy social cost, directly affecting many thousands of wage earners."  *Id.*  As a result, the legislature concluded that "[e]ach employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing benefits for its own unemployed workers."  *Id.*  "Consistent with this policy, WIS. STAT. ch. 108 is 'liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status.'"  *Operton*, 375 Wis. 2d 1, ¶32 (quoting *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 62, 330 N.W.2d 169 (1983)).

### I.   WISCONSIN STAT. § 108.02(15)(h)

¶16    Nevertheless, Wisconsin's unemployment insurance law exempts some services from the "employment" services that are covered by WIS. STAT. ch. 108.[6]  The issue in this case, then, is whether CCB and its sub-entities qualify

---

[6] For purposes of the Unemployment Compensation Act, the term "[e]mployment" means "any service, including service in interstate commerce, performed by an individual for pay."  WIS. STAT. § 108.02(15)(a).

under one of those exemptions. WISCONSIN STAT. § 108.02(15)(h) sets forth the statutory formula for the type of exemption that CCB argues is applicable here. That statute provides:

> (h) "Employment" as applied to work for a nonprofit organization, except as such organization duly elects otherwise with the department's approval, does not include service:
>
> 1. In the employ of a church or convention or association of churches;
>
> 2. In the employ of an organization operated primarily for religious purposes and operated, supervised, controlled, or principally supported by a church or convention or association of churches; or
>
> 3. By a duly ordained, commissioned or licensed minister of a church in the exercise of his or her ministry or by a member of a religious order in the exercise of duties required by such order.

Sec. 108.02(15)(h). Here, the parties' dispute is focused on subd. 2., the religious purposes exemption, which has two requirements: (1) the nonprofit organization is "operated primarily for religious purposes"; and (2) the nonprofit organization is "operated, supervised, controlled, or principally supported by a church or convention or association of churches."[7] Sec. 108.02(15)(h)2. There is no dispute that CCB and its sub-entities are nonprofit organizations and that they are "operated, supervised, controlled, or principally supported by a church." Thus, the only issue before us is whether CCB and its sub-entities are "operated primarily for religious purposes" and are therefore exempt from paying unemployment tax on behalf of their employees. *See id.*

---

[7] For ease of reading, we will refer to the controlling entity as "a church" throughout this decision rather than as "a church or convention or association of churches." *See* WIS. STAT. § 108.02(15)(h)2.

9

¶17     To date, no Wisconsin Supreme Court decision or published court of appeals decision has addressed the interpretation of the religious purposes exemption in WIS. STAT. § 108.02(15)(h)2.  Our statute, however, is essentially identical to the exemption found in the Federal Unemployment Tax Act (FUTA). *See* 26 U.S.C. § 3309(b)(1)(B).  DWD asserts—and CCB does not dispute—that § 108.02(15)(h)2. was enacted to "conform Wisconsin's unemployment law with [the] federal law in 26 U.S.C. § 3309(b)(1)(B)." *See* 1971 Wis. Laws, ch. 53, § 6. Other states have also included religious purposes exemptions in their unemployment insurance laws; however, there is a distinct lack of consensus as to the proper interpretation of the relevant statutory language among these different jurisdictions.[8]  Our task, then, is to determine the statute's meaning based on its language and relevant legal authority.

## II.   Standard of Review

¶18     On appeal, we review LIRC's decision, rather than the decision of the circuit court.  *Operton*, 375 Wis. 2d 1, ¶18.  Our scope and standard of judicial review of LIRC's decisions concerning unemployment insurance are established in WIS. STAT. § 108.09(7).  We may confirm or set aside LIRC's order, but its decision may be set aside only upon one or more of the following grounds:  (1) LIRC acted without or in excess of its powers; (2) the order or award was procured by fraud; and (3) LIRC's findings of fact do not support the order.  Sec. 108.09(7)(c)6.  An agency acts outside its power, contrary to § 108.09(7)(c)6.a., when it incorrectly

---

[8] For this reason, we certified the question in this case to our supreme court, but it denied certification.  We subsequently held oral argument in this case on August 3, 2022, in Superior, Wisconsin.

interprets a statute. *See DWD v. LIRC*, 2018 WI 77, ¶12, 382 Wis. 2d 611, 914 N.W.2d 625.

¶19     We will uphold LIRC's findings of fact if they are supported by credible and substantial evidence. *Operton*, 375 Wis. 2d 1, ¶18. Whether an employer has proven that it is exempt from coverage under Wisconsin's unemployment system involves the application of facts to a particular legal standard, which is a conclusion of law that we review independently. *See Nottelson v. DILHR*, 94 Wis. 2d 106, 116, 287 N.W.2d 763 (1980). Because the facts of this case are undisputed, the only issue on appeal is the proper interpretation of WIS. STAT. § 108.02(15)(h)2. We are not bound by LIRC's interpretation of a statute. *Operton*, 375 Wis. 2d 1, ¶19.[9] Therefore, we review LIRC's legal conclusions de novo. *Mueller v. LIRC*, 2019 WI App 50, ¶17, 388 Wis. 2d 602, 933 N.W.2d 645.

---

[9] Relying on *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21, and *Mueller v. LIRC*, 2019 WI App 50, ¶17, 388 Wis. 2d 602, 933 N.W.2d 645, the previous version of this decision suggested that while we no longer defer to administrative agency decisions on questions of law, we may still afford "due weight" to those decisions as a matter of persuasion. Although the parties did not address this question on appeal, on our own motion for reconsideration, we questioned whether "due weight" is appropriately afforded to proceedings under WIS. STAT. ch. 108, rather than only to general administrative proceedings under WIS. STAT. ch. 227. We need not and do not resolve this issue, however, as our conclusions remain the same whether or not we give "due weight" to LIRC's interpretation of WIS. STAT. § 108.02(15)(h)2.

### III. Statutory Interpretation

¶20    DWD and CCB have framed this case as a disagreement over whether WIS. STAT. § 108.02(15)(h)2. requires a reviewing body to consider either the activities or the motivations of either the nonprofit organization or the church. In particular, DWD faults the circuit court for defining "purposes" as the "reason something is done" and for holding that it is the religious motivation of the Diocese of Superior in operating CCB and its sub-entities that determines whether the organizations are operated for religious purposes. Instead, DWD argues that the term "religious purposes" requires an examination of an organization's activities, rather than its motivation, and that the "purpose" we are to examine is that of the nonprofit organization, not the church. Here, DWD asserts, CCB and its sub-entities are engaged in purely secular activities.

¶21    In contrast, CCB argues that an organization is operated primarily for religious purposes when it is operated primarily "for a religious motive or reason." Thus, motivation is the important consideration, specifically the church's motive in operating, supervising, controlling, or principally supporting the organizations. According to CCB, CCB and its sub-entities are operated primarily for a religious motive or reason—specifically, to comply with the Catholic Church's scriptural and doctrinal mandate to serve the poor and respond in charity to those in need.

¶22    We begin, as we must, with the language of the statute. *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We give statutory language its common, ordinary, and accepted meaning, except that technical or specially defined words or phrases are given their technical or special definitional meanings. *Id.* We interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to

12

the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46. "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Id.* (citation omitted). If, however, the statute "is capable of being understood by reasonably well-informed persons in two or more senses," then the statute is ambiguous. *Id.*, ¶47.

¶23    We first consider each word used in the phrase "operated primarily for religious purposes." Operate means "to work, perform, or function," "to act effectively; produce an effect; exert force or influence," or "to perform some process of work or treatment." *Operate*, https://www.dictionary.com/browse/operate (last visited Dec. 2, 2022). The term "operate" therefore connotes an action or activity. Primarily means "essentially; mostly; chiefly; principally" or "in the first instance; at first; originally." *Primarily*, https://www.dictionary.com/browse/primarily (last visited Dec. 2, 2022). The statute's use of the term "primarily" suggests that there may be other purposes for which an organization operates, and it need not be operated exclusively for religious purposes. Religious means "of, relating to, or concerned with religion." *Religious*, https://www.dictionary.com/browse/religious (last visited Dec. 2, 2022). And purpose means "the reasons for which something exists or is done, made, used, etc." or "an intended or desired result; end; aim; goal." *Purpose*, https://www.dictionary.com/browse/purpose (last visited Dec. 2, 2022). Purpose can also mean "something that one sets before himself [or herself] as an object to be attained" and "an object, effect, or result aimed at, intended, or attained." *Purpose*, WEBSTER'S THIRD NEW INT'L DICTIONARY (unabr. 1993). While these terms generally have a plain meaning interpretation, they are not necessarily dispositive of the meaning of the statute as a whole. Instead, they provide guidance in determining the statute's overall meaning.

13

### a. The Nonprofit Organization's Purpose Controls

¶24    The first question we must address to determine the statute's meaning is which entity's purpose the reviewing body is to consider: the purpose of the nonprofit organization or the purpose of the church in operating, supervising, controlling, or principally supporting the nonprofit organization. In other words, are we to consider "the reasons for which something exists or is done" from the perspective of the nonprofit organization or from the perspective of the church? As noted, the parties disagree on this point. We conclude that the statute is not ambiguous as to this question and that the plain language of WIS. STAT. § 108.02(15)(h)2. demonstrates that the reviewing body is to consider the purpose of the nonprofit organization, not the church's purpose in operating the organization.

¶25    First and foremost, the religious purposes exemption applies to "service … [i]n the employ" of the nonprofit organization, not service in the employ of the church. WIS. STAT. § 108.02(15)(h)2. As noted, we must consider the statutory language in the context in which it is used. *See Kalal*, 271 Wis. 2d 633, ¶46. Each of the subdivisions of § 108.02(15)(h) apply to an individual's "service" in a different context: § 108.02(15)(h)1. addresses church employees, § 108.02(15)(h)2. addresses employees of "an organization operated primarily for religious purposes," and § 108.02(15)(h)3. addresses ministers and members of a religious order. Therefore, considering the context of the surrounding subdivisions, we conclude that employees who fall under subd. 2. are to be focused on separately in the statutory scheme from employees of a church. *Compare* § 108.02(15)(h)1. *with* § 108.02(15)(h)2. The exemption under subd. 2. applies specifically to employees of the organizations, so the focus must be on the organizations.

¶26 Second, under the rules of statutory interpretation, an interpretation that focuses on the church's purpose could render the religious purposes exemption language unnecessary. In order to give meaning to every word in the statute, all words need to be read together. *See, e.g.*, *Kalal*, 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." (citations omitted)); *State v. Martin*, 162 Wis. 2d 883, 894, 470 N.W.2d 900 (1991) ("A statute should be construed so that no word or clause shall be rendered surplusage and every word if possible should be given effect." (citation omitted)). WISCONSIN STAT. § 108.02(15)(h)2. has two parts. The first part of subd. 2. addresses "religious purposes," and the second part, which is not at issue in this appeal, provides that the employment must be "for a nonprofit organization" that is "operated, supervised, controlled, or principally supported by a church." Sec. 108.02(15)(h)2. These distinct requirements are separated by a conjunction— "and"—meaning that *both* elements are required. Thus, the analysis of whether a nonprofit organization is "operated primarily for religious purposes" would need to be conducted only where the organization is also "operated, supervised, controlled, or principally supported by a church." Whatever "religious purposes" the church may have in operating these organizations, for purposes of the unemployment taxation law, the fact that both elements are required means we should focus on the organization, not the "parent" church.

15

*b. Both the Motives and the Activities of the Nonprofit Organization Determine Whether It Is Operated for a Religious Purpose*

¶27     The second question we must address is how the reviewing body is to determine whether a nonprofit organization has a religious purpose and whether the organization is being operated primarily for that religious purpose.  As noted above, DWD argues that it is the *activities* of the nonprofit that dictate the analysis, while CCB claims that "an enterprise must be created or exist 'chiefly/mostly for a religious *motive* or reason'" in order for it to be operated primarily for a religious purpose.  (Emphasis added.)  For the reasons that follow, we conclude that the reviewing body must consider both the organization's activities as well as the motivation behind those activities to determine whether the religious purposes exemption applies.

¶28     We again look first to the plain language of the statute to determine whether the reviewing body must consider the nonprofit organization's motives or its activities.  The phrase "religious purposes" is not defined in the statutory scheme, and DWD argues in its reply brief that the language is ambiguous, such that it is not clear from the statute's language how a reviewing body is to determine when a nonprofit organization has a religious purpose.  In support of its position, DWD observes that courts in other jurisdictions have interpreted the religious purposes

exemption in different ways, with some courts focusing on an organization's activities, others focusing on its motivations, and some considering both.[10]

¶29    As previously discussed, a statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses. *Kalal*, 271 Wis. 2d 633, ¶47.  However, "[i]t is not enough that there is a disagreement about the statutory meaning; the test for ambiguity examines the language of the statute 'to determine whether well-informed persons *should have* become confused, that is, whether the statutory … language reasonably gives rise to different meanings.'"  *Id.* (emphasis added; citation omitted).  "An otherwise unambiguous provision is not rendered ambiguous solely because it is difficult to apply the provision to the facts of a particular case."  *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, ¶20, 311 Wis. 2d 492, 753 N.W.2d 448.

¶30    Looking at the language of the statute, we disagree that the phrase "operated primarily for religious purposes" is ambiguous.  Instead, we conclude that phrase is reasonably susceptible to only one interpretation based on the plain language of the statute and when viewed in the context of the statutory scheme. *See Kalal*, 271 Wis. 2d 633, ¶¶45-46.  That interpretation requires the reviewing body to consider both the nonprofit organization's motivations and its activities to determine whether the organization qualifies under the religious purposes exemption.

¶31    We first return to the text and structure of the statute to determine its meaning "so that it may be given its full, proper, and intended effect." *See id.*, ¶44. Here, we note the use of both the words "operated" and "purposes" within the same statutory provision.  As recognized above, the word "operated" connotes an action or activity—to act, to work, to perform—meaning *what* the nonprofit organization

17

[10] *Compare* ***Concordia Ass'n v. Ward***, 532 N.E.2d 411, 413-14 (Ill. App. Ct. 1988) (concluding cemetery formed by several Lutheran churches not operated primarily for religious purposes because "[b]urial of the dead is a matter of public concern" and "[t]he functions performed by [the cemetery] are no different than those performed in a secular cemetery"); ***Terwilliger v. St. Vincent Infirmary Med. Ctr.***, 804 S.W.2d 696, 699 (Ark. 1991) (concluding Catholic hospital not operated primarily for religious purposes because although the hospital's motivation may have been religious in nature, evidence showed it was operated primarily for purpose of providing health care); ***Samaritan Inst. v. Prince-Walker***, 883 P.2d 3, 7-8 (Colo. 1994) (concluding organization providing administrative support and accreditation for religiously affiliated counseling centers not operated primarily for religious purposes because "[a]n organization that provides essentially secular services falls outside of the scope of" the religious purposes exemption); ***DeSantis v. Board of Rev.***, 372 A.2d 1362, 1364 (N.J. Super. Ct. App. Div. 1977) (concluding Catholic social service agency not operated primarily for religious purposes because provision of "nondenominational community service" for senior citizens was "eleemosynary and not religious"); ***Cathedral Arts Project, Inc. v. Department of Econ. Opportunity***, 95 So. 3d 970, 973 (Fla. Dist. Ct. App. 2012) (concluding church-affiliated organization not operated primarily for religious purposes because although motivation may have been religious, primary purpose in operating—i.e., giving art instruction to underprivileged children—was not religious); ***St. Augustine's Ctr. for Am. Indians, Inc. v. Department of Lab.***, 449 N.E.2d 246, 249 (Ill. App. Ct. 1983) (concluding organization providing aide to Native Americans in Chicago not operated primarily for religious purposes, considering the organization's activities and not its motivation); ***Imani Christian Acad. v. Unemployment Comp. Bd. of Rev.***, 42 A.3d 1171, 1175 (Pa. Commw. Ct. 2012) (holding Christian school not operated primarily for religious purposes because no evidence as to the extent of religious underpinnings that pervade curriculum), *with* ***Department of Emp. v. Champion Bake-N-Serve, Inc.***, 592 P.2d 1370, 1371-73 (Idaho 1979) (holding commercial bakery operated by Seventh Day Adventists exempt because students perform work under tenets of religion stressing value of labor and work); ***Schwartz v. Unemployment Ins. Comm'n***, 2006 ME 41, ¶¶1-3, 11, 13, 895 A.2d 965 (finding that nondenominational charitable work did not prevent the organization from being operated primarily for religious purposes where mission was to demonstrate "God's love and compassion to marginalized people in the area [it] serve[s]" (alterations in original)); ***Kendall v. Director of Div. of Emp. Sec.***, 473 N.E.2d 196, 198-99 (Mass. 1985) ("The fact that the religious motives of the [Catholic] sisters … also serve the public good by providing for the education and training of the mentally [handicapped] is hardly reason to deny the Center a religious exemption."); ***Peace Lutheran Church v. Unemployment Appeals Comm'n***, 906 So. 2d 1197 (Fla. Dist. Ct. App. 2005) (concluding child care organization operated by the church, located on the church property, and subsidized by the church exempt because its services and church outreach were religious purposes); *see also* ***By the Hand Club for Kids, NFP, Inc. v. Department of Emp. Sec.***, 2020 IL App (1st) 181768, ¶¶21, 39, 51-54, 188 N.E.3d 1196 (noting that courts "generally have been 'quite cautious in attempting to define, for tax [and unemployment insurance] purposes, what is or is not a "religious" activity or organization—for obvious policy and constitutional reasons'" and concluding that a court will instead consider "all the facts and circumstances of a particular case in order to decide whether an organization is engaged in primarily religious activities" (alteration in original; citations omitted)); ***Community Lutheran Sch. v. Iowa Dep't of Job Serv.***, 326 N.W.2d 286, 287, 291-92 (Iowa 1982) (finding that religious schools separately incorporated from church were operated primarily for religious purposes, but considering both the school's activities and statement of purpose).

18

does and *how* it does it. "Purpose," in contrast, has been defined to mean "the reasons for which something exists or is done," *Purpose*, https://www.dictionary.com/browse/purpose (last visited Dec. 2, 2022), suggesting that motive should be considered such that we should ask *why* the organization acts. While the appearance of both words in the statute might suggest ambiguity, we conclude that those words reveal the intended effect of the religious purposes exemption.

¶32    In that way, DWD and CCB are not necessarily wrong in their respective plain language analyses. The problem is that each party focuses on different words and fails to read the statute as a whole. For example, if we focus on the word "purposes," as CCB does, we may conclude that qualification for the exemption is based on the organization's reason for acting or its motivation, without considering whether the work performed or the services provided are inherently "religious." If, however, we focus on the word "operated," as DWD appears to do, we may conclude that the focus of the exemption is on the actions of the organization, meaning its activities and the work it is performing, without allowing any consideration of whether the work is part of a central mission of a religion. Both words appear in the statute and therefore both must be given meaning.

¶33    The only reasonable interpretation of the statute's language is that the reviewing body must consider both the *activities* of the organization as well as the organization's professed *motive* or purpose. Neither consideration alone is sufficient under the statute. If the reviewing body considered only the activities of the nonprofit organization, it would essentially render the word "purposes" superfluous because the organization's reason for acting, or motivation, would not be a consideration. Given the mandate that statutes are to be "read where possible to give reasonable effect to every word," *see Kalal*, 271 Wis. 2d 633, ¶46, this

19

interpretation would be unreasonable. Therefore, under a plain language reading of the statute, for an employee's services to be exempt from unemployment tax the organization must not only have a religious motivation, but the services provided— its activities—must also be primarily religious in nature.

¶34 There are other reasons why an organization's motivation cannot be the sole determination. Here, again we highlight the use of the term "operated," this time as it is used in conjunction with "primarily." Had the legislature intended that the reviewing body focus on only the motives of the organization to determine a religious purpose, there would be no need to include the phrase "operated primarily." Instead, those words could have been removed from the statute to provide that an employee's services are exempt from taxation if they are "in the employ of an organization with religious purposes." To give effect to the phrase "operated primarily," rather than render the phrase unnecessary within the statutory scheme, the only reasonable reading of the statute is that the reviewing body should also look to the organization's operations—its activities, meaning the particular services individuals receive—and determine if they are primarily religious in nature.

¶35 This reading of the religious purposes exemption—considering both the motivations and the activities of the nonprofit organization—is also in line with the rules of statutory interpretation. As DWD argues, the unemployment insurance law is remedial in nature; therefore, the statutes must be "liberally construed" to provide benefits coverage, and exceptions to the law must be interpreted narrowly. *See **Princess House***, 111 Wis. 2d at 62; *see also **Wisconsin Cheese Serv., Inc. v. DILHR***, 108 Wis. 2d 482, 489, 322 N.W.2d 495 (Ct. App. 1982) ("In order to foster a reduction of both the individual and social consequences of unemployment, courts have construed the statutes broadly."). "A general rule of statutory construction is that exceptions within a statute 'should be strictly, and reasonably, construed and

extend only as far as their language fairly warrants.' If a statute is liberally construed, 'it follows that the exceptions must be narrowly construed.'" *McNeil v. Hansen*, 2007 WI 56, ¶10, 300 Wis. 2d 358, 731 N.W.2d 273 (citations omitted); *see also* ***Dominican Nuns v. La Crosse***, 142 Wis. 2d 577, 579, 419 N.W.2d 270 (Ct. App. 1987) ("Taxation is the rule, and exemption the exception. As a result, '[s]tatutes exempting property from taxation are to be strictly construed and all doubts are resolved in favor of its taxability.'" (alteration in original; citation omitted)). "[T]he burden of proving entitlement to [a tax] exemption is on the one seeking the exemption. 'To be entitled to tax exemption the taxpayer must bring himself [or herself] within the exact terms of the exemption statute.'" ***Wauwatosa Ave. United Methodist Church v. City of Wauwatosa***, 2009 WI App 171, ¶7, 321 Wis. 2d 796, 776 N.W.2d 280 (citation omitted).

¶36 Here, DWD argues, and we agree, that a narrow interpretation is appropriate because it protects an employee's eligibility for benefits. As noted above, WIS. STAT. ch. 108 is "liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status." ***Princess House***, 111 Wis. 2d at 62. The more broadly the religious purposes exemption is read, the more employers are exempt and the larger impact the exemption will have on unemployment compensation coverage for employees of those organizations as well as all employees who are impacted by the reserve fund being depleted. *See* WIS. STAT. §§ 108.02(4)(a) (benefits are dependent on employee's base period, which is impacted if employer is exempt), 108.18(1) (requiring employer to pay contributions to the unemployment reserve fund based on yearly payroll). Construing the statute broadly ignores the stated public policy purposes of the unemployment insurance compensation program. *See* WIS. STAT. § 108.01.

¶37 For this reason, LIRC's decision rejected an approach that considered only an organization's motivations because it would cast too broad a net. As DWD explained, if the reviewing body looked only at motives, "it would allow the organization to determine its own status without regard to its actual function." This analysis could allow any nonprofit organization affiliated with a church to exempt itself from unemployment insurance by professing a religious motive without being required to provide support for that motive. *See **Living Faith, Inc. v. Commissioner***, 950 F.2d 365, 372 (7th Cir. 1991) (noting, in an income tax exemption case, that "[w]hile we agree with Living Faith that an organization's good faith assertion of an exempt purpose is relevant to the analysis of tax-exempt status, we cannot accept the view that such an assertion be dispositive" and further observing that "[p]ut simply, saying one's purpose is exclusively religious doesn't necessarily make it so"). Allowing an organization to possibly create its own exemption would effectively render the "operated primarily for religious purposes" language unnecessary and without effect under the law. Such a broad reading of the statute is contrary to the requirement that we must construe the religious purposes exemption narrowly to guarantee that the exemption is applied only when necessary. An interpretation that considers the activities of each individual organization seeking the exemption in addition to its professed motives accomplishes that directive.

¶38 CCB's response is that "[a]ll Catholic entities (and many other religious entities) operate their own unemployment system(s). The church provides equivalent benefits to CCB employees, more efficiently at lesser cost." CCB therefore claims, quoting the circuit court, that "CCB employees are all 'covered.'" This argument is a nonstarter. Whether an organization provides private unemployment insurance to its employees is not a factor under the religious

22

purposes exemption. CCB has not identified any language in the statute altering the analysis if an employer provides additional or other coverage, and, as DWD argues, considering the availability of such coverage in the analysis would impermissibly add words to the statute. *See State v. Simmelink*, 2014 WI App 102, ¶11, 357 Wis. 2d 430, 855 N.W.2d 437 (a court "should not read into [a] statute language that the legislature did not put in" (citation omitted)). Further, as DWD observes, the religious purposes exemption "cannot be interpreted one way for Catholic entities and another way for entities affiliated with different faiths." Thus, we decline to rewrite the religious purposes exemption to consider the availability of private unemployment insurance; that fact is therefore immaterial to the statute's interpretation or application.

¶39 Instead, DWD directs our attention to the Seventh Circuit Court of Appeals' decision in *United States v. Dykema*, 666 F.2d 1096 (7th Cir. 1981), which we find instructive. The question before the Seventh Circuit in that case was whether a church was an exempt organization under 26 U.S.C. § 501(c)(3), which grants tax exempt status to "[c]orporations … organized and operated exclusively for religious … purposes."[11] *Dykema*, 666 F.2d at 1099. In considering the "term

---

[11] As noted previously, CCB and its sub-entities are exempt from federal income tax under 26 U.S.C. § 501(c)(3) under a group exemption. *See supra* note 5. CCB therefore argues in its briefing and at oral argument that "[f]ederal law has already decided the issue" in this case as "[p]ursuant to that interpretation by [the] IRS, each CCB entity in this case has been continuously determined by the IRS to be operating 'exclusively' for a religious purpose." (Formatting altered.)

We agree with DWD that CCB's assertion is not supported by the record. The IRS did not determine that CCB and its sub-entities are operated exclusively for religious purposes. According to the record, the organizations are covered under a group exemption, "[s]ubordinate organizations under a group exemption do not receive individual exemption letters," and the exemption applies to educational and charitable institutions, not just religious organizations. *See* 26 U.S.C. § 501(c)(3) ("Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes …."). Thus, the IRS group ruling did not determine that the employers in this case are operated exclusively for religious purposes.

'religious purposes,'" the court stated that it is "simply a term of art in tax law." *Id.* at 1101. According to the court, the IRS's role is "to determine whether [the organization's] actual activities conform to the requirements which Congress has established as entitling them to tax exempt status." *Id.* The Seventh Circuit explained:

> In connection with this inquiry, it is necessary and proper for the IRS to survey all the activities of the organization, in order to determine whether what the organization in fact does is to carry out a religious mission or to engage in commercial business. Such a survey could be made by observation of the organization's activities or by the testimony of other persons having knowledge of such activities, as well as by examination of church bulletins, programs, or other publications, as well as by scrutiny of minutes, memoranda, or financial books and records relating to activities carried on by the organization.
>
> Typical activities of an organization operated for religious purposes would include (a) corporate worship services, including due administration of sacraments and observance of liturgical rituals, as well as a preaching ministry and evangelical outreach to the unchurched and missionary activity in partibus infidelium; (b) pastoral counseling and comfort to members facing grief, illness, adversity, or spiritual problems; (c) performance by the clergy of customary church ceremonies affecting the lives of individuals, such as baptism, marriage, burial, and the like; (d) a system of nurture of the young and education in the doctrine and discipline of the church, as well as (in the case of mature and well developed churches) theological seminaries for the advanced study and the training of ministers.

*Id.* at 1100. The court also concluded that an objective inquiry into the activities of an organization would not run afoul of the First Amendment, but that entering into a subjective inquiry with respect to the truth of the organization's religious beliefs would "be forbidden." *Id.*

¶40     In summary, the *Dykema* court's decision endorses an interpretation of the religious purposes exemption that considers both motives and activities. The

court expressly held that under a similar inquiry in the federal tax code, "it is necessary and proper for the IRS to survey all the *activities* of the organization, in order to determine whether what the organization in fact does is to carry out a religious *mission*." *See id.* (emphasis added); *see also Living Faith*, 950 F.2d at 372 ("Put simply, saying one's purpose is exclusively religious doesn't necessarily make it so. This [c]ourt and others have consistently held that an organization's purposes may be inferred from its manner of operations."). Thus, a review considering both the organization's activities and its motivations would comport with the *Dykema* court's analysis, which we conclude is sound.

¶41    DWD also cites our supreme court's decision in *Coulee Catholic Schools v. LIRC*, 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868, which LIRC relied on in reaching its decision. There, our supreme court held that the Free Exercise Clause of the First Amendment to the United States Constitution and article I, section 18 of the Wisconsin Constitution precluded a teacher who had been laid off from a Catholic school from bringing an age discrimination claim against her former employer under the Wisconsin Fair Employment Act. *Coulee*, 320 Wis. 2d 275, ¶¶1-3. The court explained that the state may not "interfere with the hiring or firing decisions of religious organizations with a religious mission with respect to employees who are important and closely linked to that mission"—a principle that is colloquially called the ministerial exception. *Id.*, ¶¶39, 67.

¶42    In order to determine whether the ministerial exception is applicable, our supreme court explained that courts must conduct a two-part test. *Id.*, ¶¶45, 48. The first part of the test asks whether the organization "has a fundamentally religious mission" "in both statement and practice." *Id.*, ¶48. In other words, "does the organization exist primarily to worship and spread the faith?" *Id.* That determination is fact-specific, as

> [i]t may be, for example, that one religiously-affiliated organization committed to feeding the homeless has only a nominal tie to religion, while another religiously-affiliated organization committed to feeding the homeless has a religiously infused mission involving teaching, evangelism, and worship. Similarly, one religious school may have some affiliation with a church but not attempt to ground the teaching and life of the school in the religious faith, while another similarly situated school may be committed to life and learning grounded in a religious worldview.

*Id.* The second part of the ministerial exception test then asks how close an employee's work is to the organization's fundamental mission. *Id.*, ¶49. After applying this test, the *Coulee* court determined that the employer in that case—a school committed to the inculcation of the Catholic faith—had a fundamentally religious mission and that the teacher's position was closely linked to that mission, and it thereafter dismissed her claim. *Id.*, ¶¶72-80.

¶43 The analysis conducted in *Coulee* provides guidance in understanding the religious purposes exemption here. While we acknowledge that *Coulee* is factually and legally distinguishable, we cite the decision as a tool to help further understand the language in WIS. STAT. § 108.02(15)(h)2. In *Coulee*, to determine an organization's mission, our supreme court considered not only the motives of the organization or its stated purpose, but it also required that the motive or mission be clear "in both statement and *practice*." *Id.*, ¶48 (emphasis added). "Practice" means the "actual performance or application." *Practice*, https://www.merriam-webster.com/dictionary/practice (last visited Dec. 2, 2022). Stated differently, practice means the organization's *activities*. Accordingly, *Coulee* is instructive as to the type of analysis that can inform the meaning of the religious purposes exemption and lends support to an interpretation that considers both an organization's motives and activities.

¶44     Finally, DWD cites a report of the House Ways and Means Committee (the House Report) pertaining to an amendment to FUTA.  DWD claims that the House Report on the bill to amend FUTA informs the interpretation of the Wisconsin statute because WIS. STAT. § 108.02(15)(h)2. was enacted to conform Wisconsin law to 26 U.S.C. § 3309(b)(1)(B).[12]  *See* ***Leissring v. DILHR***, 115 Wis. 2d 475, 485-88, 340 N.W.2d 533 (1983) (relying on congressional committee reports on bills amending FUTA when interpreting Wisconsin laws enacted to conform with FUTA).

¶45     The House Report explains the federal religious exemption in 26 U.S.C. § 3309(b)(1)(B).  It provides, in relevant part, that § 3309(b)(1)(B)

> excludes services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and is operated, supervised, controlled, or principally supported by a church (or convention or association of churches).  Thus, the services of the janitor of a church would be excluded, but services of a janitor for a separately incorporated college, although it may be church related, would be covered.  A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or a house of study training candidates to become members of religious orders.  On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage

---

[12] CCB challenges DWD's reliance on the House Report, arguing that these types of reports "have been repeatedly called into question" because "[l]egislative history is a 'rival text' created by a group other than the voting legislature, which has no authority."  Thus, CCB argues that it is improper to rely upon any extrinsic source.  However, courts may consider an extrinsic source if that source confirms the plain reading of the text, so long as the extrinsic source is not treated as authoritative on the meaning of the text.  ***United Am., LLC v. DOT***, 2021 WI 44, ¶18, 397 Wis. 2d 42, 959 N.W.2d 317; ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶51, 271 Wis. 2d 633, 681 N.W.2d 110.  Further, DWD argues that the House Report is a reliable extrinsic source because it was relied on by the United States Supreme Court to discern legislative intent as to 26 U.S.C. § 3309.  *See* ***St. Martin Evangelical Lutheran Church v. South Dakota***, 451 U.S. 772, 781 (1981).  Accordingly, we see no reason to ignore the House Report.

> or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes.

H.R. Rep. No. 91-612, at 44 (1969). DWD argues, and we agree, that the House Report demonstrates that the religious purposes exemption was not intended to apply to religiously affiliated organizations whose activities are primarily comprised of the provision of what are otherwise viewed as not inherently religious, charitable services, despite the asserted "religious in orientation" or "church related" nature of the organization. Instead, the House Report is clear that the focus of the religious purposes exemption is on the type of religious activities engaged in by the organization even where the religious motive of the organization is clear.

### c. The First Amendment Is Not Implicated

¶46     CCB, however, rejects an interpretation of the religious purposes exemption focusing on activities rather than only motives, arguing that it violates the First Amendment because "[a] determination by the state that CCB is not 'religiously purposed enough,' represents a constitutionally impermissible Free Exercise violation." (Formatting altered.) In essence, CCB argues that considering activities favors those religious entities that engage in proselytizing and provide services only to members of their own religion, which would impermissibly burden CCB's free exercise of the Catholic tenet of "solidarity"—i.e., "[b]eing ecumenical in social ministry." As CCB stated during oral argument, we should look at the religious purposes exemption under First Amendment standards, beginning with the requirement that the organization hold a sincerely held religious belief. *See Coulee*, 320 Wis. 2d 275, ¶62; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022).

¶47     We disagree that the First Amendment is implicated in this case. The First Amendment to the United States Constitution provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[13] U.S. CONST. amend. I. First, we note that

---

[13] "The first portion of this provision contains what is called the 'Establishment Clause,' and the second portion is called the 'Free Exercise Clause.'" *Coulee Cath. Schs. v. LIRC*, 2009 WI 88, ¶35, 320 Wis. 2d 275, 768 N.W.2d 868. The First Amendment has been held applicable to the states under the terms of the Fourteenth Amendment. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

the parties do not argue that the statute itself violates the First Amendment, meaning that CCB does not assert a facial constitutional challenge. Second, neither DWD nor this court dispute that the Catholic Church holds a sincerely held religious belief as its reason for operating CCB and its sub-entities. As we addressed previously, however, we do not look to the church to determine "religious purposes" under the statute; we look to the employing organizations themselves.

¶48 Third, and finally, CCB does not develop a proper First Amendment argument aside from its statements at oral argument that it has a sincerely held religious belief and that it is being denied a benefit as a result of that belief. Our review demonstrates, however, that the religious purposes exemption is not a generally available benefit that is being denied to CCB; CCB is simply being treated like every other employer in the state, including other nonprofit organizations operated by a church. To the extent that CCB is arguing that it is *not* being treated the same as other nonprofit organizations operated by churches that condition the availability of their services on adherence to, or instruction in, religious doctrine, that result is what the statute provides, and, as noted, CCB does not assert a facial challenge.

¶49 Further, neither the statute itself nor any purported interpretation of the statute seeks to penalize, infringe, or prohibit any conduct of the organizations based on religious motivations, practice, or beliefs. *See Tony & Susan Alamo*

---

Our state constitution also provides for religious freedom under article I, section 18 of the Wisconsin Constitution, known as the Freedom of Conscience Clauses. *Coulee*, 320 Wis. 2d 275, ¶¶56, 58. Our supreme court "has stated that Article I, Section 18 serves the same dual purposes as the Establishment Clause and Free Exercise Clause of the U.S. Constitution." *Id.*, ¶60. The rights provided by the Wisconsin Constitution, however, "are far more specific" and "contain[] extremely strong language, providing expansive protections for religious liberty." *Id.* Although CCB asserted during oral argument that the Wisconsin Constitution offers more protection than the First Amendment, this argument was undeveloped. Accordingly, we will not address this argument further. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

*Found. v. Secretary of Lab.*, 471 U.S. 290, 303 (1985) ("It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights."); *see also* **Coulee**, 320 Wis. 2d 275, ¶65 ("We do not mean to suggest that anything interfering with a religious organization is totally prohibited. General laws related to building licensing, taxes, social security, and the like are normally acceptable."). We see no free exercise concern.

¶50 DWD also raises its own First Amendment argument, asserting that the religious purposes exemption must be interpreted to avoid excessive state entanglement with church matters. According to DWD, any interpretation of the religious purposes exemption that "requires the state to interpret religious doctrine and examine religious leaders as to their religious motivations risks excessive unconstitutional entanglement of the state and church," which would violate the First Amendment's Establishment Clause. Indeed, "[e]xcessive entanglement occurs 'if a court is required to interpret church law, policies, or practices.'" *St. Augustine Sch. v. Taylor*, 2021 WI 70, ¶43, 398 Wis. 2d 92, 961 N.W.2d 635 (citation omitted).

¶51 DWD argues that its interpretation of the phrase "operated primarily for religious purposes" avoids this concern because it "focuses on an organization's activities and does not require the state or the court to examine or interpret church canons or internal church policies." DWD asserts that "[i]n contrast[,] an interpretation focusing on a religious entity's religious motivation requires an examination of church doctrine and an inquiry into the motivations of the church's religious leaders." *See Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 326, 533 N.W.2d 780 (1995) ("[T]he First Amendment to the United States

31

Constitution prevents the courts of this state from determining what makes one competent to serve as a Catholic priest since such a determination would require interpretation of church canons and internal church policies and practices.").

¶52     Conversely, CCB argues that DWD's interpretation of the religious purposes exemption would result in an Establishment Clause violation because "[b]y allowing exemption to those religions which view 'proselytizing' and discriminating against non-adherents in the provision of services as part of their mission, [DWD] is favoring those religions over Catholicism." CCB contends the "easiest way" for a reviewing body to "'entangle' itself in religion is to promote one practice (proselytizing, etc.) over another (ecumenical delivery of charity)."

¶53     We conclude that an interpretation considering both the motivations and the activities of the organization appropriately balances an employee's ability to receive unemployment benefits with a religious organization's right to be free from state interferences, thereby avoiding excessive entanglement concerns. For support, we again turn to *Dykema*, where the court observed that an analysis considering the activities of an organization was constitutionally appropriate:

> Objective criteria for examination of an organization's activities thus enable the IRS to make the determination required by the statute without entering into any subjective inquiry with respect to religious truth which would be forbidden by the First Amendment. [*United States*] *v. Ballard*, 322 U.S. 78, 86-88 (1944). Likewise there is no "establishment of religion" involved in determining that entitlement to tax exemption has been demonstrated vel non. As well said by Chief Justice Burger in *Walz v. Tax Commission*, 397 U.S. 664, 675 (1970): "There is no genuine nexus between tax exemption and establishment of religion." Indeed, it should be emphasized that no real questions regarding "religion" as referred to in the First Amendment are involved in the case at bar at all; the word "religious" concerns us merely in its statutory meaning as a description of a type of organization which Congress chose to exempt from taxation, believing that such relief from the tax burden would be beneficial and desirable in the public interest.

*Dykema*, 666 F.2d at 1100-01 (footnotes omitted); *see also **Wisconsin Evangelical Lutheran Synod v. Prairie Du Chien***, 125 Wis. 2d 541, 553-54, 373 N.W.2d 78 (Ct. App. 1985) ("[T]here is no 'establishment of religion' involved in determining that a church or religious organization is entitled to a tax exemption," and "a determination denying a tax exemption is similarly not a violation of the religion clauses of the federal constitution." (citation omitted)). Thus, the way for a reviewing body to avoid excessive entanglement under the religious purposes exemption is to conduct a neutral review based on objective criteria.

¶54 Based on the foregoing, we conclude that the only reasonable interpretation of the phrase "operated for religious purposes" requires the reviewing body to consider the motivations as well as the activities of the nonprofit organization to determine whether the religious purposes exemption applies. This interpretation is consistent with the plain language of the statute, case law, and extrinsic sources, and it does not run afoul of constitutional considerations. Further, focusing on the stated motivations and the organization's activities allows the reviewing body to conduct an objective, neutral review that is "highly fact-sensitive" without examining religious doctrine or tenets. *See **Coulee***, 320 Wis. 2d 275, ¶48; ***Dykema***, 666 F.2d at 1100.

*d. CCB and Its Sub-entities at Issue in this Case Are Not Operated Primarily for Religious Purposes*

¶55    Having determined the proper interpretation of the religious purposes exemption, our final responsibility is to apply the statutory language to the facts of this case.  In doing so, we conclude that CCB and its sub-entities failed to meet their burden to establish that they are exempt from Wisconsin's unemployment insurance program and that LIRC properly determined that each of the employers was "operated primarily to administer [or provide] social service programs" that are not "primarily for religious purposes."  We reiterate that there are no factual disputes in this case, and CCB does not challenge LIRC's factual findings.  Furthermore, we conclude that the evidence in the record supports LIRC's determination that CCB and its sub-entities at issue in this case are not operated primarily for religious purposes.

¶56    Our first consideration is whether the nonprofit organizations have a professed religious motivation.  In other words, do the nonprofit organizations themselves assert that their reason for existing or acting is motivated by a religious purpose?  This first step is not demanding, however, as it based on the organization's own words and statements, including its mission statement.  If the organization states that it has a religious motive, then the reviewing body must accept that assertion and move on to the next consideration, which is whether the activities of the nonprofit organization are primarily religious.

¶57    As to the first consideration, we conclude that the nonprofit organizations in this case have a professed religious motivation.  We acknowledge that the professed reason that CCB and its sub-entities administer these social service programs is for a religious purpose:  to fulfill the Catechism of the Catholic Church.  CCB itself is the organization, as the diocese's social ministry arm, with

the most clearly professed religiously purposed motivation: "The mission of Catholic Charities is to provide service to people in need, to advocate for justice in social structures, and to call the entire church and other people of good will to do the same." We note, however, that when we look to the motivations of the individual sub-entities of CCB, not the mission of CCB or the church, the religious purpose is less evident. As is clear from the mission statements, as well as from the Form 990 that each organization filed with the IRS, the sub-entities' missions are to provide charitable services to everyone without any reference to religion.[14] While we conclude that the sub-entities do not appear to have an independent professed religious motivation, we acknowledge that there is a professed religious motivation for CCB overseeing and supporting these sub-entities and, in turn but to a lesser degree, in those sub-entities' own work.

¶58    As to the second consideration—whether the activities of the organizations are primarily religious—we agree with LIRC that the activities of CCB and its sub-entities are the provision of charitable social services that are neither inherently or primarily religious activities. CCB and its sub-entities do not operate to inculcate the Catholic faith; they are not engaged in teaching the Catholic religion, evangelizing, or participating in religious rituals or worship services with the social service participants; they do not require their employees, participants, or

_____

[14] For example, Headwaters' mission statement is as follows: "We believe all people deserve the right to achieve their fullest potential. Therefore, we exist for the purpose of providing individualized services that are designed to maximize each person's daily living and vocational skills in order to be integrated into the community to the fullest extent possible." Similarly, BCDS's stated mission "is to provide person-centered services to adults based on the needs of each individual so that they are able to live their lives to the fullest." BRI states that its mission is to "[i]n partnership with the community, provide people with disabilities opportunities to achieve the highest level of independence." Finally, DSI's mission is "[t]o provide a prevocational and vocational program by using real work situations, such as subcontract and other production oriented work, to develop appropriate work behaviors, to maximize earnings and to increase an individual's potential for community employment. To provide employment opportunities for adults with disabilities."

board members to be of the Catholic faith; participants are not required to attend any religious training, orientation, or services; their funding comes almost entirely from government contracts or private companies, not from the Diocese of Superior; and they do not disseminate any religious material to participants. Nor do CCB and its sub-entities provide program participants with an "education in the doctrine and discipline of the church." *See Dykema*, 666 F.2d at 1100.

¶59 Instead, the work that CCB and its sub-entities engage in is primarily charitable aid to individuals with developmental and mental health disabilities. As noted previously, the employers provide work training programs, life skills training, in-home support services, transportation services, subsidized housing, and supportive living arrangements. While these activities fulfill the Catechism of the Catholic Church to respond in charity to those in need, the activities themselves are not *primarily* religious in nature. This fact is demonstrated most significantly by one of CCB's sub-entities, BCDS. LIRC found that BCDS—which was not brought under the CCB umbrella until 2014—had "no previous religious affiliation" and that "[t]he type of services and programming provided by the organization did not change" following its affiliation with CCB. The fact that the manner in which BCDS carried out its mission did not change after it became an affiliate of CCB supports our conclusion that BCDS' purpose and operations are not primarily religious.

¶60 Regarding CCB itself, as noted above, we acknowledge the clear religious motivation of CCB in supporting and operating its sub-entities. However, the actual activities in which CCB engages involve providing administrative support for its sub-entities which we have determined do not engage in primarily religious activities. CCB is not separately and directly involved in religiously oriented activities. We are cognizant that the result in this case would likely be different if

36

CCB and its sub-entities were actually run by the church, such that the organizations' employees were employees of the church. *See* WIS. STAT. § 108.02(15)(h)1. Instead, CCB and its sub-entities are structured as separate corporations—and CCB makes no claims to the contrary—so we must view their motives and activities separate from those of the church. The corporate form does make a difference, especially with respect to the statutory scheme we must apply in this case. When considered independent of the church's overarching doctrine and purposes, CCB and its sub-entities are clearly operated to provide services in a manner that is neither inherently nor primarily religious.

¶61 We agree with LIRC's conclusion that the employers here are "akin to 'the religiously-affiliated organization committed to feeding the homeless that has only a nominal tie to religion' recognized by the *Coulee* court." Like the school in *Coulee*, CCB and its sub-entities are affiliated with the Catholic Church and under the control of the bishop; as LIRC recognized, however, unlike the school in *Coulee*, "CCB and its sub-entities are not operated with a focus on the inculcation of the Catholic faith and worldview and do not operate in a worship-filled environment or with a faith-centered approach to fulfilling their mission." Any such spreading of Catholic faith accomplished by the organizations providing such services—while genuine in deriving from and adhering to the Catholic Church's mission—is only indirect and not primarily the service that they provide to individuals. We further observe parallels between CCB and its sub-entities and the example in the House Report of "a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) [that] would not be considered under [the religious purposes exemption] to be operated primarily for religious purposes." *See* H.R. Rep. No. 91-612, at 44.

¶62　　We recognize that CCB and its sub-entities perform important and vital work in our communities.　Nevertheless, the fact that a church operates, supervises, controls, or supports an organization in charity with a religious motivation does not, by itself, mean that the organization is operated primarily for religious purposes.　While the Catholic Church's tenet of solidarity compels it to engage in charitable acts, the religious motives of CCB and its sub-entities appear to be incidental to their primarily charitable functions.　Thus, CCB and its sub-entities have not demonstrated through their activities a primarily religious purpose.　Accordingly, we affirm LIRC's decision and reverse the circuit court's order reversing that decision.

*By the Court.*—Order reversed.